# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-60152

ZENERGY, INCORPORATED,

Plaintiff - Appellant

v.

PERFORMANCE DRILLING COMPANY, L.L.C.,

Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

March 17, 2015

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:10-CV-483

Before KING, DAVIS, and OWEN, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Zenergy, Inc., appeals the district court's grant of a directed verdict in favor of Defendant-Appellee Performance Drilling Company, L.L.C., in this action for breach of a daywork oil and gas drilling contract. For the following reasons, we AFFIRM the judgment of the district court.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-60152

**I.**

Zenergy, Inc., hired Performance Drilling Company, L.L.C., to drill an oil well in Calcasieu Parish, Louisiana. The well was intended to be a vertical well with a bottom hole depth of 11,800 feet. The contract Zenergy and Performance entered into was an International Association of Drilling Contractors ("IADC") form onshore daywork drilling contract (the "Contract"). Zenergy was the operator[1] under the Contract and Performance was the drilling contractor.[2]

Prior to beginning work on the well, Zenergy gave Performance a copy of the drilling procedure, which indicated that the well was to be drilled vertically.[3] Under the terms of the Contract, Performance was to provide a conventional drift indicator, which is a tool used to measure the deviation of the wellbore. The conventional drift indicator that Performance provided was called a "Sure Shot."

Performance began drilling in December 2008. In addition to Performance's drilling crew, Zenergy had a company representative, Dean Dick, present at the drilling site. Per Zenergy's instructions, Performance conducted deviation surveys every 1,000 feet. The results of those deviation surveys, along with other information about the progress of the well, were logged on API-IADC form daily drilling reports (which were given to Zenergy). For the first few weeks of drilling, the Sure Shot surveys showed a deviation

---

[1] In the context of the oil and gas business, an operator is "[t]he company that serves as the overall manager and decision-maker of a drilling project." Entry for *Operator* in *The Oilfield Glossary*, Schlumberger, http://glossary.oilfield.slb.com/en/Terms/o/operator.aspx.

[2] A contractor is "[t]he company that owns and operates a drilling rig." Entry for *Drilling Contractor* in *The Oilfield Glossary*, Schlumberger, http://glossary.oilfield.slb.com/en/Terms/d/drilling_contractor.aspx.

[3] The parties apparently agree that, for purposes of this case, a well with a deviation of less than five degrees from true vertical would be considered a vertical well.

2

of less than one degree.[4]  Then, on January 2, 2009, a Sure Shot survey ran at 9,504 feet reported a deviation of seven degrees or greater.[5]  Performance called out a technician who examined—and ultimately replaced—the Sure Shot tool.  On the field ticket for replacing the Sure Shot, the technician wrote "pendulum bent."  Meanwhile, Zenergy called in a third-party contractor, Multi-Shot, to perform a more-accurate gyroscopic deviation survey.  Because the Multi-Shot technician mistakenly downloaded data from a different deviation survey, the Multi-Shot survey reported a deviation of only two degrees.  Their concerns settled, Zenergy instructed Performance to resume drilling.

The surveys on the new Sure Shot continued to report a deviation of two and one quarter degrees or less, and the well was drilled to a depth of 11,060 feet.  Zenergy then called out Schlumberger, another third-party contractor, to "log" the well.  Schlumberger informed Zenergy that its hole was severely deviated.  Incredulous, Zenergy called Multi-Shot back out to perform another gyroscopic deviation survey.  This time, the correct data was downloaded, and the Multi-Shot survey showed that Zenergy had a wellbore that was deviated by twenty degrees and horizontally displaced by 1,145 feet.  Zenergy then had the drill backed up to a point where the wellbore was still vertical, had the deviated portion of the wellbore cemented in, and had the hole redrilled as a vertical well.

---

[4] What the Sure Shot tool actually reported was hotly contested at trial, but, given the posture of this case, we view the evidence in the light most favorable to Zenergy.  *See Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 622 (5th Cir. 2008) (reciting that in reviewing a Rule 50(a) motion for judgment as a matter of law "we view all of the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion" (internal quotation marks omitted)).

[5] The Sure Shot tool used in this case could only record a deviation of up to seven degrees.  As such, the deviation may have been—and in fact was later shown to have been—greater than seven degrees.

No. 14-60152

After the well was completed, Zenergy paid Performance for only the days during which the wellbore was deviated by less than five degrees. The parties met in Houston to attempt to resolve their dispute but were ultimately unsuccessful.

Zenergy sued Performance in Louisiana state court seeking a declaratory judgment stating that it owed no further money to Performance under the Contract. Performance counterclaimed alleging breach of contract and seeking payment for the twenty-three days of drilling for which Zenergy has not paid. Performance removed the action to federal court and it was transferred to the Southern District of Mississippi. Before the district court, Zenergy argued that it owed Performance no further payment because Performance breached the Contract by drilling a deviated well, failing to provide a working conventional drift indicator, failing to provide accurate reports, violating the covenant requiring compliance with Louisiana law, and failing to perform in a good and workmanlike manner. After a six-day jury trial, the district court granted Performance's motion for a directed verdict, holding that under the Contract Zenergy bore all of the risk of a deviated wellbore. Nevertheless, the district court concluded that Performance could still be held liable for fraudulent acts notwithstanding the Contract, and therefore the district court instructed the jury only on an intentional misrepresentation cause of action that neither party had pleaded. The jury returned a special verdict finding Performance not liable.[6] Zenergy timely appealed.

---

[6] Zenergy argues that the district court erred in instructing the jury on an intentional misrepresentation theory of recovery on the basis of implied consent under Federal Rule of Civil Procedure 15(b)(2). Rule 15(b)(2) states that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2). Assuming *arguendo* the district court erred in so doing, we find that such error is harmless. *See* Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."). Zenergy argues that it was prejudiced by the district court sending the

No. 14-60152

## II.

This court reviews a district court's ruling on a Rule 50 motion for judgment as a matter of law de novo, applying the same standard as the district court. *Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 235 (5th Cir. 2001). Judgment as a matter of law may be granted "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In deciding a motion for judgment as a matter of law, we view the evidence in the light most favorable to the non-moving party. *Hagan*, 529 F.3d at 622.

"Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045; *see also Sovereign Ins. Co. v. Tex. Pipe Line Co.*, 488 So. 2d 982, 984 (La. 1986). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La Civ. Code art. 2046; *see also Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 589 (La. 2007). In interpreting the words of a contract, the words "must be given their generally prevailing meaning;" however, "[w]ords of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047. When the words of the contract are ambiguous, they "must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code art. 2048. When the

---

intentional misrepresentation claim to the jury because, as it never pleaded or argued for such a claim, Zenergy had no opportunity to put on evidence to prove such a claim. Yet we fail to see how, in this particular situation, Zenergy was prejudiced by being unable to put on evidence of a claim it never intended to bring in the first place. As the jury returned a verdict finding Performance not liable for intentional misrepresentation, Zenergy is in exactly the same position it would have been in had the district court not instructed the jury as to an intentional misrepresentation claim.

parties to a contract have "made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose." La. Civ. Code art. 2054. Equity "is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another," whereas usage "is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation." La. Civ. Code art. 2055.

There are, broadly speaking, three types of contracts for the drilling of an onshore oil and gas well: the daywork contract, the footage contract, and the turnkey contract. Owen L. Anderson, *The Anatomy of an Oil and Gas Drilling Contract*, 25 Tulsa L.J. 359, 374 (1990). Generally speaking, in a daywork contract, the operator pays the contractor a fixed price per day to drill the well and assumes all of the risks of the drilling operation except for those expressly assigned to the contractor. *See id.* At the other end of the spectrum is the turnkey contract, in which the operator pays the contractor a fixed price for drilling the well to a specific depth or formation and the contractor assumes considerably more risk due to his general control over the drilling operation. *Id.* at 378.[7] A footage contract falls between the two, with the contractor being paid a fixed price per foot of well drilled and assuming greater risk than under a daywork contract but less risk than under a turnkey contract. *Id.* at 376–77. The hallmark of each type of contract is the amount of control the operator has over the drilling operation. *See id.* at 375 ("Under the traditional daywork contract, the operator is in charge of directing the drilling operation. In other

---

[7] It is called a turnkey contract because, "[u]nder a 'pure' turnkey contract, in the event a commercial quantity of oil or gas is discovered, the contractor completes the well so that the operator may simply 'turn the key' to commence production." *Id.*

words, a daywork contract is similar to the contractor's lease of a rig, related equipment, and crew to the operator."); *id.* at 377 ("The IADC footage contract specifies that the operator is an independent contractor, and that the 'Contractor shall direct, supervise and control drilling operations and assumes certain liabilities to the extent specifically provided for herein.' Accordingly, at the outset the contractor more clearly assumes the general risk associated with drilling under a footage contract rather than a daywork contract."); *id.* at 378 ("In general, a drilling contractor assumes more risk under the turnkey contract than under the other types of contracts because the contractor has general control of all drilling operations."). As under a daywork contract the contractor has less control over the drilling operation than under a turnkey contract, the contractor assumes only "specified risks, while the general risk of delay and the risk of liabilities not assumed by the contractor are on the operator." *Id.* at 375.

The Contract signed by Zenergy and Performance is a form IADC daywork drilling contract. Zenergy argues that Performance breached the Contract by (a) failing to drill a vertical well in accordance with Zenergy's instructions, though no provision of the Contract expressly required that the well be vertical; (b) failing to comply with Louisiana law, in breach of paragraph 8.3 of the Contract ("Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract."); failing to provide accurate reports of the work performed, in violation of paragraph 8.4 of the Contract ("Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator."); failing to furnish a working conventional drift indicator, in violation of exhibit A, paragraph 4.4

of the Contract (indicating that a "Conventional drift indicator" "shall be provided at the well location at the expense of Contractor"); and failing to perform its obligations under the Contract in a good and workmanlike manner, in violation of an obligation to do so implied in the Contract by Louisiana law. Yet none of the provisions of the Contract cited by Zenergy speaks to the allocation of the risk of a deviated wellbore. *See* La. Civ. Code art. 2054 ("When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose."); La. Civ. Code art. 2045 ("Interpretation of a contract is the determination of the common intent of the parties.").

The Contract does, however, begin by stating that Performance was to "furnish equipment, labor, and perform services . . . for a specified sum per day under the direction, supervision and control of [Zenergy]." Given this allocation of control over the drilling operation, the Contract states that Performance "assumes only the obligations and liabilities stated herein" and that "[e]xcept for such obligations and liabilities specifically assumed by [Performance], [Zenergy] shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations." Zenergy claims that it owes Performance no further payment under the Contract because, by breaching the above-referenced provisions of the Contract, Performance caused the wellbore to be drilled as a deviated well and not as a vertical well. But Zenergy's argument would subvert the plain language of the Contract and the intent of the parties by morphing Performance's obligation to "furnish equipment, labor, and perform services" into a guarantee of the final product of those services. Further, we are

unpersuaded that Performance would have been willing to accept the risk of liability for a deviated wellbore under the Contract given Zenergy's ultimate control over the drilling process. That control is evidenced in this case by the fact that Zenergy—not Performance—selected the bottom hole assembly used to drill the well. It is also evidenced by the fact that it was Zenergy who called out Multi-Shot to perform the ill-fated first gyroscopic deviation survey. It is also the general commercial expectation in the drilling industry that it is the operator in a daywork contract who bears the risk of a deviated wellbore. *See* Anderson, *supra*, at 386 ("In a daywork contract, the drilling contractor may agree to exercise due diligence and care to maintain a straight hole; however, the risk and expense of maintaining a straight hole is on the operator."); *id.* at 386 n.148 ("In the IADC daywork form, the contractor makes no representations concerning the drilling of a straight hole."); *id.* at 415 ("The drilling contractor agrees to drill a straight hole, unless a directional well is specified, and also agrees to make all deviation surveys specified in the contract. . . . However, under a typical daywork contract, the risk of a deviated hole is generally borne by the operator because the operator has more control over drilling operations."); *id.* at 447–48 ("[T]he operator under a contract containing daywork provisions . . . may obtain insurance covering the risk of redrilling the well should problems arise. . . . Potential problems include deviation from the straight hole specifications . . . . Generally, the model drilling contract forms place all liability for the costs of redrilling on the operator if operations are being conducted on a daywork basis."); American Petroleum Institute, Drilling Contract § 8.5 ("While operations are being performed on a daywork basis, Contractor agrees to exercise due diligence and care to maintain the straight hole specifications, if any, set forth in the Drilling Order, but all risk and expense of maintaining such specifications or restoring the hole to a condition suitable to Operator shall be assumed by Operator."),

*reprinted in* Anderson, *supra*, 480 app. B.  The parties' intentions at the time of contracting are also clarified by looking to the other contracts that they had available to them had they wanted to allocate risk differently.  The IADC footage contract expressly assigns the risk of the wellbore becoming deviated to the contractor.  IADC, Drilling Bid Proposal & Footage Drilling Contract—U.S. § 9.4 ("Should the hole at any depth during the time Contractor is performing work on a Footage Basis, have either a deviation from vertical or a change of inclination in excess of the limits prescribed in Exhibit 'A', Contractor agrees to restore the hole to a condition suitable to Operator either by conventional methods and procedures while drilling ahead or by cementing off and redrilling."), *reprinted in* 7A West's Texas Forms—Minerals, Oil & Gas § 16:1 (4th ed. 2014).  Tellingly, under the IADC footage contract, when the work is being performed on a daywork basis rather than on a footage basis, "Contractor agrees to exercise due diligence and care to maintain the straight hole specifications, if any, set forth in Paragraph 3 of Exhibit 'A' but all risk and expense of maintaining such specifications or restoring the hole to a condition suitable to Operator shall be assumed by Operator."  *Id.*  The IADC turnkey contract also assigns the risk of a deviated wellbore to the Contractor.  IADC, Model Turnkey Contract § 9.5 ("Should the hole, at any depth during the time Contractor is performing work on a Turnkey Basis, have either a deviation from vertical or a change in overall angle in excess of the limits prescribed in Exhibit 'A', Paragraph 4, Contractor agrees to restore the hole to a condition suitable to Operator either by conventional methods and procedures while drilling ahead or by cementing off and redrilling."), *reprinted in* 7A West's Texas Forms—Minerals, Oil & Gas § 16:3 (4th ed. 2014).  As with the IADC footage contract, in the IADC turnkey contract, when the work is being performed on a daywork basis, "Contractor agrees to exercise due diligence and shall maintain the straight hole specifications, if any, set forth

in Paragraph 4 of Exhibit 'A' but all risk and expense of maintaining such specifications or restoring the hole to a condition suitable to Operator shall be assumed by Operator." *Id.* Given the alternative contracts available to Zenergy and Performance—the daywork provisions in both of which assigned responsibility for a deviated wellbore to the operator—their selection of the daywork contract elucidates their intentions with respect to the allocation of this risk. Further evidence is provided by the testimony of Robert "Skip" Graham, the president of Zenergy's engineering division, about Zenergy's reasons for selecting a daywork contract for the well when they had used a turnkey contract for their earlier well on the same drilling unit. Graham testified:

> [G]enerally, in a turnkey contract . . . there is . . . a 30 or 40 percent premium built into that so that the contractor can make a profit. There were no difficulties encountered in drilling that first well down to the depths that we were intending to drill the second well. And as a result, we decided to drill it on a daywork basis because you can do it, theoretically, cheaper that way.

That thirty to forty percent premium is no doubt responsive, at least in part, to the greater risk allocated to the contractor in a turnkey contract as opposed to a daywork contract. Reallocating that risk after the fact—and without the thirty to forty percent premium—would give Zenergy more than it bargained for. We decline to hold Performance to the risk allocation of a turnkey contract without the attendant risk premium. As such, we conclude that the district court did not err in granting Performance's motion for a directed verdict.[8]

---

[8] Performance also argues that the deviation from straight hole specifications constitutes loss of or damage to the hole, a risk assigned to the operator under paragraph 14.5 of the Contract. Paragraph 14.5 reads: "The Hole: In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein." There was conflicting testimony at trial as to whether a deviated hole constitutes a lost or damaged hole. Given our conclusion that the risk of the deviated wellbore is borne by the operator, we need not resolve that conflict here.

11

No. 14-60152

## III.

Zenergy also contends that the district court erred in denying its motion to alter or amend the judgment to reduce the judgment by $9,000, which represents a $500 per day surcharge for the days during which the hole was bring drilled at an angle of greater than seven and a half degrees under sections 4.4 and 27.15 of the Contract.  Section 27.15 states: "If directional or uncontrolled hole exceeds 7 1/2 degree deviation that will be an additional charge of $500.00 per day."  Section 4.4 states, *inter alia*, that "[d]irectional or uncontrolled deviated hole will be deemed to exist when deviation exceeds 7 1/2 degrees or when the change of angle exceeds 2 1/2 degrees per one hundred feet."  We review a district court's denial of a motion to alter or amend the judgment for abuse of discretion.  *Martinez v. Johnson*, 104 F.3d 769, 771 (5th Cir. 1997); *Jones v. Cent. Bank*, 161 F.3d 311, 312 (5th Cir. 1998).  "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence."  *Perez v. Stephens*, 745 F.3d 174, 177 (5th Cir. 2014).  Zenergy's first argument, that the district court erred because Zenergy never instructed Performance to drill a deviated wellbore, is waived for failure to raise it in the motion to alter or amend the judgment before the district court.  *See Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 267 (5th Cir. 2014) ("The general rule of this court is that arguments not raised before the district court are waived and will not be considered on appeal" (internal quotation marks omitted)); *Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 595 (5th Cir. 2007) ("If an argument is not raised to such a degree that the district court has an opportunity to rule on it, we will not address it on appeal." (internal quotation marks omitted)).  Zenergy's second argument, that Performance is not entitled to the $500 per day surcharge because it never sent Zenergy an invoice, also fails.  Paragraph 5.1 of the Contract states that "[p]ayment for mobilization, drilling and other

12

work performed at applicable rates, and all other applicable charges shall be due, upon presentation of invoice therefor, upon completion of mobilization, demobilization, rig release or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur." The district court denied Zenergy's motion based on its finding that Performance "only discovered details surrounding the extent and duration of the deviation during discovery, since plaintiff elected not to share its deviation information with Performance in a method that would have timely allowed Performance to submit an invoice for the deviation charge." That finding is supported by the testimony of David "Grumpy" Farmer, the president of Performance, that Performance did not receive the deviation information from the Multi-Shot survey that Zenergy ordered and therefore did not have information that showed that Perfomance had been drilling at an angle greater than seven and a half degrees. To the extent other evidence in the record undermines that testimony, we cannot say that the district court's resolution of the conflict was a clearly erroneous assessment of the evidence. *See United States v. Trujillo*, 502 F.3d 353, 356 (5th Cir. 2007) ("Giving due regard to the opportunity of the district court to judge the credibility of the witnesses, we will deem the district court's factual findings clearly erroneous only if, based on the entire evidence, we are left with the definite and firm conviction that a mistake has been committed." (internal quotation marks omitted)); *In re Bradley*, 501 F.3d 421, 434 (5th Cir. 2007) ("However, his arguments simply boil down to questions of witness credibility and the bankruptcy court's weighing of the evidence. We are particularly mindful of the opportunity of the bankruptcy court to judge the credibility of the witnesses." (internal quotation marks omitted)). As such, we hold that the district court did not abuse its discretion in determining that paragraph 5.1 of the Contract does not preclude payment of an amount due under the Contract where the party's ability to submit an invoice was inhibited

by the other party to the Contract. *Cf.* Restatement (Second) of Contracts § 271 ("Impracticability excuses the non-occurrence of a condition if the occurrence of the condition is not a material part of the agreed exchange and forfeiture would otherwise result."); Restatement (Second) of Contracts § 271 cmt. b; Restatement (Second) of Contracts § 205 illus. 7.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.