# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 21, 2020

Lyle W. Cayce
Clerk

No. 18-20453

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND CERTAIN INSURANCE COMPANIES, subscribing to Policy Nos. JHB CJP-1861, JHB CJP-1959, and 13PKGN9161; WALTER OIL & GAS CORPORATION; TANA EXPLORATION COMPANY, L.L.C.; HELIS OIL & GAS COMPANY, L.L.C.,

>Plaintiffs - Appellants

v.

AXON PRESSURE PRODUCTS INCORPORATED, formerly known as Church Energy Services Ltd.; AXON EP, INCORPORATED,

>Defendants - Third Party Plaintiffs - Appellees

AXON ENERGY PRODUCTS AS,

>Defendant - Appellee

v.

HERCULES DRILLING COMPANY, L.L.C.; HERCULES OFFSHORE, INCORPORATED,

>Third Party Defendants - Appellees – Appellants

Appeals from the United States District Court
for the Southern District of Texas

No. 18-20453

Before CLEMENT, ELROD, and DUNCAN, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

This byzantine dispute arises out of a catastrophic oil well blowout that occurred in 2013 on the HERCULES 265 drilling rig in the Gulf of Mexico. The rig's charterer brought products-liability claims against a refurbisher of the rig's blowout-prevention components, setting off a cascade of counterclaims and third-party claims based on various indemnity provisions in the web of contracts among the parties. Eventually, the district court granted a series of summary judgments, based both on contractual indemnity and also on the merits of the liability claims. For the reasons discussed below, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings.

I.

We here provide a sketch of the background facts and proceedings. We dive later into deeper detail as needed when addressing specific issues.

Axon Pressure Products, Inc. and Axon EP, Inc. (together, "Axon") manufacture and service equipment used in offshore oil rigs. In 2010, Axon was hired by non-party Seahawk Drilling, Inc. to work on equipment on the rig that would eventually feature in this case—the HERCULES 265 drilling unit. Axon refurbished and remanufactured various parts on the rig designed to help prevent well blowouts.

In 2011, Hercules Drilling Company, at that point the owner of the HERCULES 265, entered an Offshore Daywork Drilling Contract (the "Drilling Contract") with Walter Oil & Gas Corporation. Under that agreement (as later amended), Walter chartered the HERCULES 265, located in the Gulf of Mexico. Hercules provided the rig and crew to Walter for re-working the A-3 well, located about 84 miles south of Houma, Louisiana. The Drilling Contract contained various provisions allocating liabilities between Walter and Hercules.

No. 18-20453

In 2013, a blowout occurred at the A-3 well that the crew was unable to contain. Oil, gas, and other materials blasted up through the well at dangerously high pressure. The blowout caught fire and burned for several hours before sealing itself off, in the process causing extensive damage to the rig and other property. As required by federal law, Walter assembled a team of independent well-control experts to investigate the incident. The experts eventually produced multiple reports suggesting that human error led to the blowout.

Walter incurred over $70,000,000 in expenses resulting from the blowout. It tendered various claims to its insurers, Certain Underwriters at Lloyd's, London and Certain Insurance Companies Subscribing to Policy Nos. JHB CJP-1861, JHB CJP-1959, and 13PKGN9161 (together, "Underwriters"). Underwriters paid out over $48,000,000 in claims to Walter.

Walter and Underwriters (as a subrogee of some of Walter's claims) then sued Axon.[1] Walter asserted products-liability claims against Axon, alleging that the parts it had worked on malfunctioned, causing the blowout. Tana Exploration Company and Helis Oil & Gas Company—which both owned non-operating working interests in the A-3 well—also sued Axon.  (Together, we refer to Underwriters, Walter, Tana, and Helis as "Plaintiffs.")

In response, Axon filed counterclaims against Walter for indemnity as a third-party beneficiary under the Drilling Contract, as well as a breach of contract claim against Underwriters as a third-party beneficiary of Underwriters' promise to release claims against anyone Walter had released from liability. Axon also brought a third-party complaint against Hercules.[2]

---

[1] Other defendants were also named, but Plaintiffs have either dismissed or settled the claims against them.

[2] Axon also sued Hercules Offshore, Inc. "Hercules" collectively refers to Hercules Offshore, Inc. and Hercules Drilling Company.

3

Axon asserted that it was the failure of Walter or Hercules personnel to operate the rig correctly that caused the blowout. Axon sought defense, indemnity, and attorney's fees from both Walter and Hercules.

In response to Axon's lawsuit, Hercules tendered its defense and indemnity to Walter, asserting that Walter had contractually assumed the liabilities Hercules then faced as a result of Axon's claims. Walter did not respond, and later moved for summary judgment on the issue. It sought a declaration that it did not owe defense and indemnity to Hercules for Axon's claims. In response, Hercules filed a third-party complaint against Axon and Walter. It sought indemnity and contribution from both.

The parties moved for summary judgment on various issues.[3] Axon sought a ruling that Hercules owed Axon indemnity for all claims by Walter and the other plaintiffs. The district court granted the motion and held that Hercules was obligated to defend and indemnify Axon for any losses from Plaintiffs' claims. Axon also moved for summary judgment against Plaintiffs on the substance of their products-liability claims. First, Axon contended that Plaintiffs failed both to prove causation and to show that Axon's products were defective. Separately, Axon asserted that Plaintiffs failed to produce evidence of damages. The district court eventually granted each of Axon's motions, though it did not provide a reasoned opinion for some of its decisions.

Hercules moved for summary judgment, seeking a ruling that Walter was required to defend and indemnify Hercules for any losses resulting from Axon's claims against Hercules. The court granted the motion.

To sum up: an oil well blowout caused millions in damage. Plaintiffs sued Axon for products liability. Axon then counterclaimed against Plaintiffs and

---

[3] Axon also filed multiple motions to strike various expert evidence, which the district court granted. We turn to these motions in Part IV(B) below.

No. 18-20453

brought a third-party complaint against Hercules. Hercules then brought a third-party complaint against Axon and Plaintiffs. The district court granted summary judgment on various indemnity and merits issues and also struck several expert reports and evidence, with Axon winning on most issues.

Plaintiffs and Hercules now appeal different decisions by the district court. Plaintiffs appeal the grant of summary judgment in Axon's favor on the merits of the products-liability claims. They also appeal the district court's decisions striking various expert reports and evidence. Walter appeals the district court's decision that it owes a duty to release and indemnify both Hercules and Axon. Hercules appeals the court's determination that it owes duties to defend and indemnify Axon.

## II.

We review a grant of summary judgment *de novo*, applying the same standard as the district court. *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "We construe all facts and inferences in the light most favorable to the nonmoving party," *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (quoting *Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005)), but "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence," *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012). Finally, "we are not limited to the district court's reasons for its grant of summary judgment and may affirm . . . on any ground raised below and supported by the

5

No. 18-20453

record." *Boyett v. Redland Ins. Co.*, 741 F.3d 604, 606–07 (5th Cir. 2014) (cleaned up).

We review the exclusion of expert testimony for abuse of discretion. *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *CenterPoint Energy Hous. Elec. LLC v. Harris Cty. Toll Rd. Auth.*, 436 F.3d 541, 550 (5th Cir. 2006) (quoting *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005)).

## III.

We turn first to the various indemnity issues. The parties' indemnity obligations are governed by a web of contracts. This simple diagram outlines the contours of those contractual relationships:



We will detail the relevant contractual provisions as needed.

No. 18-20453

Defending the district court's decisions in its favor, Axon posits a scheme that extinguishes Plaintiffs' claims against it. It asserts that either (1) Walter must directly indemnify Axon for Walter's own claims against Axon, or (2) Walter must indemnify and defend Hercules against Axon's claims, which would result in circular indemnity, such that Walter would ultimately pay for its own successful claims against Axon.

Resolution of these indemnity questions requires multiple steps. We first address whether Hercules must defend and indemnify Axon against Walter's claims. We then address whether Walter must directly indemnify Axon for Walter's own claims. Last, we address whether Walter must defend and indemnify Hercules against Axon's claims, which in turn arise from Walter's claims against Axon.

## A. *Hercules' Duty to Indemnify Axon under the Seahawk Contract*

The district court concluded that Hercules was required to indemnify Axon under the Seahawk Contract. We agree.

### 1.

On June 16, 2010, Axon entered a Master Service Agreement (the "Seahawk Contract") with a company called Seahawk Drilling, Inc. At the time, Seahawk owned the HERCULES 265. Under the Seahawk Contract, Axon was placed on a list of providers who could perform work for Seahawk. When Seahawk had work for Axon, it would submit a work or purchase order for a specific job. Seahawk hired Axon to work on the HERCULES 265. Specifically, Axon was hired to refurbish—among other blowout preventer ("BOP") equipment—the blind shear rams ("BSRs"), which were part of the BOP stack.

The Seahawk Contract provided that it would "remain in force and effect until canceled by either party by giving the other party ten (10) days prior written notice." An indemnity clause required Seahawk to "release, [d]efend,

indemnify, and hold harmless [Axon] from and against any and all [l]osses arising out of personal or bodily injury, sickness, disease or death or property damage, destruction or loss suffered by any member of Company Group in connection with this [a]greement." "Company Group" included Axon, its parent, subsidiaries, affiliates, and contractors, and various other parties.

Two days after Axon signed the Seahawk Contract, it entered into a similar service agreement with Hercules (the "Hercules Contract"). The Hercules Contract stated that it was to "supersede, amend, and restate any prior service or supply agreements or access agreements between [Hercules] and [Axon]." It was to "apply as a master service agreement to new [w]ork commenced during this Contract." An indemnity clause provided that "the parties . . . shall release, protect, defend, indemnify and hold harmless the other party and their insurers and subrogees . . . to the extent in each case . . . that such [liability] is caused by the negligence or other legal fault of the indemnifying party."

Seahawk ran into financial trouble and filed for bankruptcy. As part of that proceeding, Seahawk sold assets to Hercules, including the HERCULES 265 and the equipment Axon worked on. Hercules also bought "all of the interests, rights, [c]laims, and benefits arising or accruing to [Seahawk] under any [c]ontracts to which [Seahawk] is a party." Hercules assumed "the [l]iabilities of [Seahawk] under the terms of any [a]ssigned [c]ontract to the extent that such [l]iabilities are performance obligations, or otherwise attributable to the period from and after the [c]losing."

The Seahawk Contract was assigned to Hercules. The bankruptcy court specifically approved the purchase. The court also indicated that the transactions under the asset purchase agreement ("Purchase Agreement") would "be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the [p]urchasers and [s]ellers."

No. 18-20453

The agreement closed on April 27, 2011. *See In re Seahawk Drilling, Inc.*, No. 11-20089-RSS, 2011 WL 13323774 (Bankr. S.D. Tex. Apr. 27, 2011).

When Plaintiffs sued Axon, it sought defense and indemnity from Hercules under the Seahawk Contract. The district court granted summary judgment for Axon on the issue, holding that the Seahawk Contract controlled the parties' indemnity obligations for purposes of Plaintiffs' claims, and that under the contract, Hercules owed Axon defense and indemnity.

2.

The question of indemnity under the applicable contract is reviewed *de novo*. *Chevron USA, Inc. v. Aker Mar. Inc.*, 689 F.3d 497, 501 (5th Cir. 2012). We may affirm on any ground that was presented to the district court even if it did not ultimately form the basis of the district court's decision. *CQ, Inc. v. TXU Mining Co.*, 565 F.3d 268, 274 (5th Cir. 2009).

3.

Hercules asserts that the Hercules Contract, not the Seahawk Contract, governs indemnity between Hercules and Axon. Its core argument is that, since the Hercules Contract superseded all previous contracts between the parties, and because Hercules "stepped into the shoes" of Seahawk by assuming its contracts through the Purchase Agreement, the Hercules Contract supersedes the Seahawk Contract and the indemnity provision in the Hercules Contract governs here. We disagree and conclude that the Seahawk Contract governs. We therefore hold that Hercules must release, defend, indemnify, and hold harmless Axon for the claims Plaintiffs make against it.

As an initial matter, we conclude that the indemnity provision in the Seahawk Contract was triggered by Plaintiffs' suit against Axon. The contract requires Hercules to defend and indemnify Axon "from and against any and all [l]osses arising out of . . . property damage, destruction or loss suffered by any member of Company Group in connection with this [a]greement." "Company

Group" included "any entities for whom [Hercules] is performing services or providing goods." The group thus includes Walter because Hercules was "performing services" for Walter under the Drilling Contract. And Plaintiffs' claims against Axon arise in connection with the Seahawk Contract—that is, Plaintiffs claim Axon's work on the BOP was defective.

The next question is whether, as Hercules claims, the Hercules Contract superseded the Seahawk Contract. We hold that it did not, for several reasons. First, the Seahawk Contract was not a prior contract between Hercules and Axon. Axon and *Seahawk* entered the Seahawk Contract on June 16, 2010. Axon and Hercules entered the Hercules Contract on June 18, 2010. As of that date, Hercules was not a party to the Seahawk Contract, and therefore by its own terms the Hercules Contract could not have "supersede[d], amend[ed], and restate[d]" the Seahawk Contract. *See Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 366 (5th Cir. 2009) ("no sound basis" for concluding that later contract superseded earlier contract when contracts were not "*between the same parties*").

Second, the parties to the Seahawk Contract did not cancel it. By its own terms, the Seahawk Contract would "remain in force and effect until canceled by either party by giving the other party ten (10) days prior written notice." Hercules points to no evidence that any party to the contract gave the required notice to cancel the contract.

Third, Hercules fails to point to evidence that Axon's work on the BOP was performed pursuant to the Hercules Contract. The Hercules Contract provided that it applied "as a master service agreement to new [w]ork commenced during this [c]ontract." But the record evidence shows that the work Axon did on the BOP was under the Seahawk Contract. The purchase order for the work on the BOP body lists Seahawk as the customer. So do the

purchase orders for the rams. Hercules does not point to contradictory evidence.

Contrary to Hercules' arguments, the revision of a repair data book does not create a fact question on this issue. An Axon executive testified that a revised repair data book was provided to Hercules after its purchase from Seahawk in order to reflect the change. He also testified that the revised version of the work orders "identify and describe the same work performed by Axon" pursuant to the purchase order that identifies Seahawk as the customer. In other words, the records establish that Axon performed work on the BOP and other equipment for *Seahawk*, and that after Hercules purchased Seahawk's assets the books were changed to reflect the new ownership, not to show that Axon performed work for *Hercules* on the BOP equipment.

Similarly, the district court's statement that the BOP was "refurbished by Axon after the [Hercules Contract] was executed" does not show the existence of a material fact dispute. Even assuming that the district court's statement, without any accompanying citation to evidence, could create a fact dispute, this statement does not establish that Axon performed work *for Hercules* on the BOP. Rather, it states that at some point after June 18, 2010—the date of the Hercules Contract—Axon performed work on the BOP. The evidence shows that the work on the BOP was performed for Seahawk. Further, Hercules did not finalize its purchase of Seahawk's assets—including the HERCULES 265—until April 27, 2011. *See Seahawk*, 2011 WL 13323774. Any work performed on the rig before then would necessarily have been performed on a rig owned by Seahawk, so whether work was performed on the BOP after June 18, 2010 is irrelevant—the relevant question is whether work was performed on the BOP after April 27, 2011. Hercules points to no such evidence.

For these reasons, we hold that the Seahawk Contract governed the obligations of Axon and Hercules with regard to the underlying lawsuit. The district court correctly granted summary judgment for Axon on this issue.[4]

### B. *Walter's Duty to Indemnify Axon under the Drilling Contract*

The second indemnity question is whether Walter was required, by virtue of the Drilling Contract, to directly indemnify Axon for the very claims Plaintiffs brought against Axon. Contrary to the district court's ruling, we conclude that Walter was not required to do so.

1.

Hercules and Walter entered into the Drilling Contract in 2011.[5] Section 501 of the contract outlines "[Walter]'s Standard of Performance." It provides that "[e]xcept for . . . obligations and liabilities specifically assumed by" Hercules, Walter is "solely responsible and assumes liability for all consequences of operations by both parties while on a daywork basis." Those consequences include "results and all other risks or liabilities incurred in or incident to or connected with, directly or indirectly, such operations."

Other provisions in the Drilling Contract allocate specific risks between the two parties. Article IX contains several provisions relevant to this appeal.

---

[4] Hercules makes a drive-by assertion that the district court erred by dismissing its counterclaims against Axon for indemnity at law, contribution, and breach of contract. Hercules' argument on the issue is brief and wholly conclusory, and it fails to respond to Axon's argument that Hercules has waived the issue. We agree with Axon and hold that the issue is waived. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010) (argument not pressed on appeal is waived).

[5] Under the Drilling Contract, Walter was the "Operator" and Hercules was the "Contractor." "An operator is the company that serves as the overall manager and decisionmaker of a drilling project." *Zenergy, Inc. v. Performance Drilling Co.*, 603 F. App'x 289, 290 n.1 (5th Cir. 2015) (unpublished) (cleaned up). "A contractor is the company that owns and operates a drilling rig." *Id.* at 290 n.2 (cleaned up). For ease of reading, we substitute "Walter" for "Operator" and "Hercules" for "Contractor" when quoting the contract.

Section 902[6] obligates Walter to indemnify Hercules for damage to or loss of the hole or downhole property. Section 905(b)[7] requires Walter to indemnify Hercules for losses caused directly or indirectly by "pollution or contamination." Section 906[8] mandates indemnity for Hercules "for the cost of removal of all wreck and debris" and for the cost of "regaining control of any wild well." And section 907[9] obligates Walter to indemnify Hercules for loss to the mineral formation or strata, as well as the loss of oil, gas, or other minerals that had not yet "been reduced to physical possession above the seabed."

The relevant subsections further specify risks for which Walter is obligated to indemnify not only Hercules, but also its suppliers, contractors, or subcontractors. For example, sections 902, 905(b), and 907 require Walter to

---

[6] "In the event the hole should be lost or damaged at any time, [Walter] shall, except as provided in Paragraph 705(f), be responsible for and hold harmless and indemnify [Hercules] and its suppliers, contractors and subcontractors of any tier from such damage to or loss of the hole, including all downhole property therein."

[7] "[Walter] shall be responsible for and hold harmless and indemnify [Hercules] and its suppliers, contractors and subcontractors of any tier against all claims, demands, causes of action, losses, and liabilities of every kind and character (including without limitation fines, penalties, assessments, third party claims, property damage, and control and removal of the pollutant involved) arising directly or indirectly from all pollution or contamination . . . which may occur including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance . . . ."

[8] "[Walter] shall at all times be responsible for and hold harmless and indemnify [Hercules] for the cost of removal of all wreck and debris (including [Hercules'] Items as provided below). [Hercules] shall be responsible for and hold harmless and indemnify [Walter] for the cost of wreck and debris removal of [Hercules'] Items to the extent required by law or to prevent interference with [Walter's] operations. [Walter] shall at all times be responsible for and hold harmless and indemnify [Hercules] for the cost of regaining control of any wild well."

[9] "[Walter] shall at all times be responsible for and hold harmless and indemnify [Hercules] and its suppliers, contractors and subcontractors of any tier from and against any and all claims on account of injury to, destruction of or loss or impairment of any property right in or to oil, gas or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the seabed, and for any loss or damage to any formation, strata, or reservoir beneath the seabed."

indemnify not only Hercules, but also its "suppliers, contractors, or subcontractors of any tier." In contrast, section 906 requires indemnification of only Hercules.

Two other sections in Article IX need our attention. First, section 911(c)[10] states that the words "be responsible for and hold harmless and indemnify" as used throughout Article IX "shall have no application to claims or causes of action asserted against [Walter] or [Hercules] which arise solely by reason of any agreement of indemnity with a person or entity" that is not a party to the Drilling Contract. Finally, section 912 explains that the provisions of Article IX, together with sections 605, 606, and 805, "shall exclusively govern the allocation of risks and liabilities of said parties without regard to cause."[11]

2.

We read contracts as a whole and give words "their plain meaning unless the provision is ambiguous." *Breaux*, 562 F.3d at 364 (quoting *Weathersby v.*

---

[10] "Except as otherwise provided herein, the parties intend and agree that the phrase 'be responsible for and hold harmless and indemnify' or other similar words of release or indemnity (including limitation or exclusion of damages and all other exculpatory provisions) in this Contract including without limitation Paragraphs 605, 606, 805, and 901 through 910 shall have no application to claims or causes of action asserted against [Walter] or [Hercules] which arise solely by reason of any agreement of indemnity with a person or entity not a party hereto. Except as otherwise provided herein, nothing contained herein shall confer any rights upon any third party beneficiary. Nothing contained herein shall confer any right of action in any person not a party hereto or identified as an indemnitee herein."

[11] "The parties recognize that the performance of well drilling, workover and associated activities such as those to be performed under this Contract have resulted in bodily injury, death, damage or loss of property, well loss or damage, pollution, loss of well control, reservoir damage and other losses and liabilities. It is the intention of the parties hereto that the provisions of this Article IX and Paragraphs 605, 606 and 805 shall exclusively govern the allocation of risks and liabilities of said parties without regard to cause (as more particularly specified in Paragraph 911), it being acknowledged that the compensation payable to [Hercules] as specified herein has been based upon the express understanding that risks and liabilities shall be determined in accordance with the provisions of this Contract."

*Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984)).[12] "Disagreement as to the meaning of a contract does not make it ambiguous, nor does uncertainty or lack of clarity in the language chosen by the parties." *Id.* (quoting *Weir v. Fed. Asset Disposition Ass'n*, 123 F.3d 281, 286 (5th Cir. 1997)).

Axon makes two general arguments in support of affirmance. First, Axon asserts that, since Hercules did not specifically assume liability for a blowout, Walter assumed those risks under section 501 of the Drilling Contract. According to Axon, it follows that Walter thus assumed the very liability that it now seeks to transfer to Axon by virtue of its products-liability suit. Second, Axon contends that the losses Walter seeks from Axon as damages fall into specific categories of loss for which Walter is required to directly indemnify Axon under the Drilling Contract.

Walter disagrees. In its view, the text of section 501 does not mention, and thus fails to create, any indemnity obligations at all. Walter also argues that Axon's broad reading of section 501 would render many other provisions meaningless. Regarding Axon's second argument, Walter argues that none of

---

[12] The parties do not appear to contest that maritime law applies to the contracts at issue. We do not address whether that is correct because it is irrelevant: wherever derived, the applicable principles of contract interpretation are general ones that are broadly applied. *See, e.g.*, Restatement (Second) of Contracts § 202(2) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."); *see also Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("This court is bound to read all parts of a contract together to ascertain the agreement of the parties. The contract must be considered as a whole. Moreover, each part of the contract should be given effect." (citations omitted)); *Lewis v. Hamilton*, 652 So. 2d 1327, 1329–30 (La. 1995) ("The words of a contract must be given their generally prevailing meaning . . . . Each provision of a contract must be interpreted in light of the other provisions, and a provision susceptible of different meanings must be interpreted with a meaning that renders it effective rather than one which renders it ineffective.").

the losses it seeks are covered by specific sections of the Drilling Contract that would require it to directly indemnify Axon.

The district court concluded section 501 established that "Walter, as operator, assumes all obligations and 'shall be solely responsible and assume[] all liability for all consequences of operations[,]' including Hercules' subcontractors[,] on any theory of law including strict liability." We disagree for the following reasons.

First, section 501 does not require Walter to directly indemnify Axon. Its plain text does not purport to create any indemnity obligations. Rather, it explains that Walter is solely responsible and assumes liabilities for any consequences of operations by both parties (*i.e.*, Walter and Hercules) that are not elsewhere specifically assumed by Hercules. "A contract of indemnity . . . should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. Unit A Aug. 1981).[13]

Accepting the district court's interpretation would leave several sections in Article IX without purpose. Take an example. If, on these facts, Walter was required to directly indemnify Axon for the losses it seeks through its lawsuit, what would be left of section 906, which obligates Walter to indemnify

---

[13] *See also Int'l Marine, L.L.C. v. Integrity Fisheries, Inc.*, 860 F.3d 754, 759 (5th Cir. 2017) (reciting same principle "[u]nder federal maritime law"); *MEMC Elec. Materials, Inc. v. Albemarle Corp.*, 241 S.W.3d 67, 71 (Tex. App. 2007) ("Indemnity provisions are to be strictly construed, pursuant to the usual principles of contract interpretation, in order to give effect to the parties' intent as expressed in the agreement."); *Liem v. Austin Power, Inc.*, 569 So. 2d 601, 608 (La. Ct. App. 1990) (general contract interpretation principles apply to indemnity agreements; interpretation is determination of common intent of parties "and when the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made").

Hercules—but *not* its subcontractors or contractors, like Axon—"for the cost of removal of all wreck and debris" as well as costs for controlling wild wells? Another hypothetical. Imagine a scenario in which the blowout here caused a massive oil spill. Section 905(b) requires Walter to indemnify Hercules and its contractors for losses caused directly or indirectly by "pollution or contamination." If section 501 actually means that Hercules must indemnify Axon directly for those losses, what work is section 905(b) doing? There are other examples, but these two make the point: Axon's reading—and the district court's—would render much of Article IX redundant. To the extent possible, we interpret contracts to avoid that result. *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004).[14]

The district court's reading of section 501 also ignores the fact that Walter and Hercules agreed on a different scope of indemnification for different risks. For some risks, such as damage to the hole, Walter agreed to indemnify Hercules *and* its subcontractors, contractors, and suppliers. But for other risks, such as the cost of debris removal and costs to control a wild well, Walter agreed to indemnify only Hercules.

Further, Axon's reading conflicts with section 912. As noted above, that section makes the provisions of Article IX, along with sections 605, 606, and 805, the exclusive provisions "govern[ing] the allocation of risks and liabilities of said parties without regard to cause." Section 501 is not on that list. Whatever work section 501 is doing, then, the parties explicitly agreed that it is not doing the work Axon thinks it is.

---

[14] *See also In re Deepwater Horizon*, 785 F.3d 1003, 1011 (5th Cir. 2015) (contracts to be interpreted to give effect to all terms without rendering any of them meaningless); *Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 37 (Tex. 2014) ("[I]nterpretations of contracts as a whole are favored so that none of the language in them is rendered surplusage."); *Hamilton*, 652 So. 2d at 1330.

Second, we disagree with Axon that Hercules seeks damages for which Walter is required to directly indemnify Axon under Article IX of the Drilling Contract. Axon primarily asserts that three provisions of Article IX—sections 902, 905(b), and 907—give it a right to direct indemnity from Walter against Walter's own claims. Each of those sections requires Walter to indemnify and release not only Hercules, but also its suppliers, contractors, and subcontractors. Section 902 covers losses for damage to the hole; section 905(b) covers losses caused directly or indirectly by pollution or contamination; and section 907 covers losses for damage to the mineral formation or strata as well as losses from oil, gas, or other minerals that had not been reduced to physical possession above the seabed. *See supra* notes 6–7, 9.

Plaintiffs seek only the cost of regaining control of the well, plugging and abandoning the well, replacing the original platform, and removing the wreckage of the damaged platform. Axon contends these damages fall into categories covered by sections 902, 905(b), or 907, and since Axon asserts it qualifies as a supplier or subcontractor of Hercules, Walter owed Axon direct indemnity under the Drilling Contract between Walter and Hercules.[15]

We disagree. Plaintiffs did not seek damages for damage to the hole itself or any downhole equipment or property. So, section 902 does not cover the damages. Similarly, Plaintiffs did not seek damages for the loss of any subsurface oil or gas, so section 907 is not implicated. Thus, neither section requires Hercules to directly indemnify Axon.

Neither does section 905(b), on which Axon places particular emphasis. That section provides that Walter "shall be responsible for and hold harmless

---

[15] We assume without deciding that Axon qualifies as either a supplier or subcontractor under the contract. Nothing in our decision precludes the district court reaching a determination on this issue should it be necessary to resolving the case on remand.

and indemnify" Hercules (and its suppliers, contractors, or subcontractors) for liability caused directly or indirectly by "all pollution or contamination . . . which may occur including . . . that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance." Axon asserts that the losses Plaintiffs seek are all included in this provision's broad language.

Axon's argument goes like this. The materials ejected during the blowout qualify as pollutants or contaminants. The losses Plaintiffs claim—well control, plugging and abandoning the well, replacing the platform, and removing wreckage—were all caused, directly or indirectly, by the expulsion of those pollutants or contaminants during the blowout, or were caused by attempts to prevent further expulsion of those substances. Thus, Plaintiffs' claimed damages are all covered by the broad language of section 905(b).

We disagree with Axon's interpretation. First, Axon's argument is hard to square with the text of the provision itself. Take, for example, Plaintiffs' damages for the costs of replacing the original platform and removing the wreckage of the old one. Those damages were caused by the fire that resulted from the blowout, not by contamination or pollution. Thus the plain meaning of section 905(b) counsels against Axon's interpretation. *See Breaux*, 562 F.3d at 364 (words in contracts given plain meaning unless ambiguous); Restatement (Second) of Contracts § 202(3) ("Unless a different intention is manifested, . . . where language has a generally prevailing meaning, it is interpreted in accordance with that meaning."). Axon does not argue that 905(b) is ambiguous, and we find no ambiguity.

Second, Axon's reading of section 905(b) would render other provisions in Article IX meaningless, an outcome courts strive to avoid. *See Chembulk*, 393 F.3d at 555. Under Axon's reading, *any* possible expenses incurred by Walter as a result of the blowout would be covered by section 905(b) because

they would have been caused, directly or indirectly, by the escape of materials qualifying as contaminants or pollutants. For example, Axon's reading would render part of section 906, which requires indemnity for the cost of controlling a wild well, superfluous—all costs of controlling a wild well would conceivably be costs incurred trying to prevent further escape of pollutants or contaminants. If section 905(b) was meant to be read that broadly, why include section 906 at all?

Third, Axon's reading again ignores the careful allocation of liability evidenced by Article IX. Hercules and Walter agreed that for some damages, Walter would indemnify only Hercules, while for others, Walter would also indemnify suppliers, contractors, and subcontractors. Reading section 905(b) as broadly as Axon does would make Hercules liable to contractors, subcontractors, and suppliers in essentially all instances, instead of only in those instances delineated in the particular sections of Article IX.

For these reasons, we hold that the district court erred by granting summary judgment to Axon on the ground that Walter was required to directly indemnify Axon for the claims Walter itself brought against Axon. We make no determination as to which provision or provisions of Article IX apply to Plaintiffs' claimed damages. We hold only that Axon's interpretation of sections 501 and 905(b)—with which the district court apparently agreed—do not justify summary judgment in its favor. We therefore reverse the summary judgment in Axon's favor on this ground.

### C. *Walter's Duty to Release and Indemnify Hercules under the Drilling Contract*

The third indemnity question we address is whether Walter was required by the contract to release and indemnify Hercules for the claims Axon brought against Hercules—resulting in "circular indemnity," where liability is simply passed from Walter, to Axon, to Hercules, and then back to Walter. This

interpretation, which Axon urges, would essentially extinguish any liability from Axon to Walter. We conclude that the contract does not support this interpretation, and so we reverse the judgment in Axon's favor on this issue.

1.

The provisions of the Drilling Contract discussed in Part III(B) are also relevant here. The key section is 911(c), which establishes that the indemnity provisions of the contract "shall have no application to claims or causes of action asserted against [Walter] or [Hercules] which arise solely by reason of any agreement of indemnity with a person or entity not a party hereto." The district court held that, notwithstanding this language, Walter was required to defend and indemnify Hercules against Axon's claims because "Axon's suit against Hercules is triggered by Underwriters' suit against Axon. In turn, Axon's suit against Hercules is based on contractual obligations between Hercules and Axon contained in an indemnity agreement."

2.

Walter argues on appeal that the district court's conclusion ignored section 911(c) and destroyed the careful distribution of liability in Article IX. We agree.

Section 911(c) exempts Walter from any obligation to indemnify Hercules for any claims brought by a third party against Hercules arising "solely by reason of any agreement of indemnity." As the district court itself acknowledged, Axon's claims against Hercules primarily arise out of the agreement between the two parties—the Seahawk Contract. *See supra* Part III(A).

Although Axon's complaint against Hercules also references claims for indemnity at law and common law contribution, creative pleading cannot disguise the fact that Axon's claim for indemnity against Hercules arises out of the Seahawk Contract.

No. 18-20453

The Drilling Contract's provisions—specifically, section 501—do not expressly obligate Walter to indemnify Hercules for purely contractual claims brought by third parties against Hercules. "[E]xpress notice is required where a party seeks to shift his contractual liability to indemnify a third party." *Corbitt*, 654 F.2d at 333.[16] No provision in the Drilling Contract provides such notice. And section 911(c) expressly prohibits that scenario.

In *Corbitt*, we stated that indemnity agreements "should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Id.* Because the contract at issue there provided for indemnity "against all claims, suits, liabilities and expenses on account of personal injury . . . arising out of or in connection with performance of this Order," but did not "expressly provide" for indemnification against claims brought by third parties, we held that Sladco (analogous here to Walter) was not bound to indemnify Shell (analogous to Hercules) for claims arising out of "Shell's own separate contractual obligations." *Id.*

So too here. Section 501 says nothing about Walter being required to indemnify Hercules for claims brought by third parties against Hercules that arise out of a contract. In fact, section 501 says nothing about indemnity at all. Adopting Axon's reading of section 501 would impose liability on Walter for Hercules' liability to Axon, a third party, and it would do so without any express acceptance of that responsibility by Walter. That interpretation would contravene the rule set forth in *Corbitt*.

To read section 501 as broadly as Axon and Hercules urge would also destroy the distinction carefully drawn between situations where Walter is

---

[16] *See also MEMC Elec. Materials*, 241 S.W.3d at 71; *Liem*, 569 So. 2d at 608.

required to indemnify only Hercules and situations where Walter must also indemnify Hercules' suppliers, contractors, or subcontractors. As previously discussed, section 906 requires Walter to indemnify Hercules—and only Hercules—for costs associated with the removal of wreckage and debris and for the costs to control any wild wells. Those are precisely the sorts of damages claimed by Plaintiffs here. To read section 501 as requiring Walter to indemnify Hercules for Axon's claims would be to ignore the limitation imposed by section 906. We decline to do so. *See Chembulk*, 393 F.3d at 555. A limitation that can be avoided simply by having a third party sue Hercules is no limitation at all.

Axon's and Hercules' arguments to the contrary are unavailing. They assert that section 501 expressly provides that all liabilities not specifically assumed by Hercules are to be borne by Walter. Since Hercules did not specifically assume the risk of removing debris or controlling a wild well, the argument goes, Walter must ultimately bear the costs. But that argument ignores section 911(c), in which Hercules *did* specifically assume liabilities caused by third-party claims arising out of agreements of indemnity between Hercules and those third parties.

Hercules also argues that section 906 demonstrates that Walter expressly assumed any costs to remove wreck or debris or the costs of controlling any wild well. But, as with the previous argument, this argument also fails to account for section 911(c), under which, as just discussed, Hercules assumed liabilities caused by third-party claims arising out of contract. If Hercules brought its own claim for the costs of removing debris or controlling a wild well, those costs may well be covered by section 906. But to read section

No. 18-20453

906 as requiring indemnification for third-party claims is to ignore section 911(c).[17]

Because section 911(c) specifically forecloses the possibility that Walter is required to indemnify Hercules for contractual obligations to third parties, and nothing else in the contract expressly provides otherwise, we hold that Walter is not obligated to indemnify Hercules for the claims Axon brings against it. We therefore conclude that the district court's contrary conclusion was error and reverse the summary judgment in Hercules' favor on this issue.

IV.

We now turn to the district court's decisions regarding various expert evidence, as well as the merits of Plaintiffs' Louisiana Products Liability Act ("LPLA") claims. To establish their products-liability claim under the LPLA, Plaintiffs were required to show that (1) a characteristic of Axon's parts proximately caused the damage; (2) the damage arose from a reasonably anticipated use of the parts; and (3) the parts at issue were unreasonably dangerous. *See* La. Stat. Ann. § 9:2800.54(A). We first examine the district court's rulings regarding expert evidence because that analysis informs our review of the summary judgment decisions. We then turn to the individual summary judgment decisions.

A. *Factual Background*

Oil, natural gas, and other subsurface deposits are often contained within their formations at high pressure. This poses a problem for those who want to drill into those formations. If a well is drilled into the formation and the pressures are not controlled, explosive blowouts can occur. To prevent

---

[17] Hercules also makes the same arguments regarding sections 902, 905(b), and 907 that we discussed in Part III(B)(3), *supra*. For the same reasons those sections do not require Walter to indemnify Axon directly, they also do not require Walter to indemnify Hercules.

materials from the deposit from entering the wellbore, fluids from the drilling rig are pumped into the wellbore to create downward pressure on the formation. If this pressure is not carefully maintained, material from the formation can enter the wellbore. If that happens, the return rate of the pressure-maintenance fluid will increase suddenly. This is referred to in the industry as a "kick." Uncontrolled kicks can lead to blowouts.

Various pieces of equipment on the drilling rig help the crew control kicks and prevent blowouts. The key piece in this case is the blowout preventer stack ("BOP stack"). For ease of reference, we include the following illustration of a BOP stack provided in Axon's brief.



The BOP stack is placed near the top end of the drill pipe. As can be seen, the BOP at issue in this case contained an annular BOP, a double ram BOP, and a single ram BOP. The annular BOP is used to seal the space around the

drill pipe known as the annulus. The single ram BOP also seals the area around the drill pipe. The double ram BOP has two sets of rams. The top set of rams, like the single ram BOP, seals the area around the drill pipe. The bottom set of rams are BSRs. When activated, they cut and seal the drill pipe itself.

Beneath the BSRs are outlets known as the kill and choke lines. The kill line pumps pressure-maintenance materials into the wellbore, and the choke line controls flow out of the wellbore. The choke line can be opened and closed manually at two different points, or it can be closed using the high closing ratio ("HCR") valve. The choke line plays a key role in this story.

The rams and HCR valve are all powered by the same source: the accumulator. The accumulator can be used to activate the rams or the HCR valve from one of three locations on the rig: the rig floor, the driller's shack, or the toolpusher's office.

In July 2013, the Hercules rig crew was removing drill pipe from the A-3 well. A kick occurred but went unnoticed. A short time later, fluid began erupting from the annulus and drill pipe onto the rig. The fluid erupted with enough force that it jammed the drill pipe into equipment overhead. This made it impossible for the crew to install a drill pipe safety valve, the usual first step in such a situation. The crew closed the annular BOP, but that did not stop the problem.

The blowout intensified. The crew decided to close the upper and lower rams from the toolpusher's office. They then activated the BSRs, which would shear and seal the pipe. They also tried to remotely close the HCR valve, which would have cut off the flow spewing out of the choke line. But the HCR valve never closed. For a moment, however, the flow from the well slowed. Three crew members decided to return to the rig floor to turn off engines there that could accidentally ignite the growing gas cloud. But as they were returning, the blowout picked up again, and they were unable to make it back to the rig

floor. Instead, they joined the rest of the crew and evacuated. After a few hours, the blowout ignited and burned for several days until the well eventually sealed itself. The rig suffered extensive damage.

As required by regulation, Walter assembled a team of independent well-control experts to investigate the blowout. *See* 30 C.F.R. § 250.1919. The experts produced a report (the "first SEMS report") and submitted it to the Bureau of Safety and Environmental Enforcement ("BSEE"). A second SEMS report was submitted later. The BSEE conducted its own investigation and issued another report, concluding that "the actions to close the rams came too late." The BSEE report states that "by the time the attempt to close [the rams] was made, the well was already flowing at a pressure exceeding the BOP's capabilities." The reports all concluded that the HCR valve had never closed, and so the choke line remained open as a path for flow from the well throughout the blowout. Ultimately, BSEE fined Walter for the crew's "inability to maintain proper completion fluid density throughout the well operations, and their failure to detect a well bore influx in a timely manner."

## B. *Exclusion of Expert Evidence*

To begin, we consider the district court's evidentiary rulings that could have affected the summary judgments awarded. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 667–68 (5th Cir. 1999) ("We must first review the trial court's evidentiary rulings . . . . Then, with the record defined, we must review *de novo* the order granting judgment as a matter of law." (citation omitted)).

### 1.

We first examine the district court's decision to grant Axon's motion to exclude "any expert testimony offered by Simon Bellemare relating to Plaintiffs' products liability claims." We vacate the district court's order excluding Bellemare's evidence because it failed to explain its decision.

No. 18-20453

Plaintiffs proffered evidence from Bellemare regarding the allegedly dangerous condition of Axon's products, the third prong of Plaintiffs' LPLA claim. *See* La. Stat. Ann. § 9:2800.54(A). Axon moved to exclude his testimony, arguing that Bellemare was unqualified and that his analysis was unreliable. The district court, in a document styled "Plenary Order," stated: "Axon's motion to exclude testimony of Simon Bellemare – GRANTED." It offered no reasons for its decision.

Axon believes this was not reversible error because the district court's decision was clearly correct based on the record, and a remand would simply waste time and resources. It relies on our decision in *North Cypress Medical Center Operating Co. v. Aetna Life Insurance Co.*, 898 F.3d 461 (5th Cir. 2018), to argue that even if the district court abused its discretion by not providing reasons for a decision, we may examine the issue on our own to decide whether the district court's ultimate decision was correct.

In *North Cypress*, we concluded that even though the district court abused its discretion by failing to explain why it denied leave to amend, remand was not the appropriate remedy because it "would likely 'be an exercise in futility.'" *Id.* at 479 (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 819 (5th Cir. 2004)). We reached that determination after observing that our precedent did not require reversal and remand, and that we have statutory authority to "affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and [we] may remand the cause and direct the entry of such appropriate judgment . . . or require such further proceedings to be had as may be just." *Id.* (quoting 28 U.S.C. § 2106). We then considered several factors and concluded after our own review of the record that the district court's decision was ultimately correct. *Id.* at 479–80.

We decline to extend *North Cypress* to this context. Here, the district court was tasked with determining the reliability of expert evidence. District

28

courts serve as gatekeepers and are responsible for ensuring the reliability and relevance of all expert evidence. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The court must ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

When a district court fails to give reasons for its decision to exclude expert testimony, a reviewing court has no way of knowing whether that gatekeeping responsibility has been adequately performed. "A statement of reasons is one of the handmaidens of judging." *Schwarz v. Folloder*, 767 F.2d 125, 133 (5th Cir. 1985). "Where a district court fails to explain its decision . . . we do not know whether the decision was within the bounds of its discretion or was based on an erroneous legal theory." *Id.* As *North Cypress* acknowledges, generally, "[r]emanding to provide the district court with an opportunity to explain its [decision] is preferred." 898 F.3d at 479.

Here, the need for the district court to explain its decision was particularly high given the stakes—the exclusion of Bellemare's testimony could devastate Plaintiffs' case. His testimony forms much of the evidentiary basis on which Plaintiffs opposed summary judgment on the "unreasonably dangerous condition" issue under the LPLA. *See* La. Stat. Ann. § 9:2800.54(A). While we do not hold that all instances in which a district court fails to give reasons for excluding expert evidence constitute reversible error, we do hold that, in this circumstance, the district court abused its discretion in failing to do so. On remand, the district court should examine afresh the admissibility of Bellemare's expert testimony and give reasons for its decision.

## 2.

We next examine the court's two orders striking evidence from various other experts. Axon moved to exclude supplemental expert reports from Sones, Bourgoyne, Williams, Rusnak, Bellemare, and Adair, arguing that the reports

were untimely and therefore violated the court's scheduling order. It later moved to strike summary judgment affidavits from Sones and Bourgoyne on timeliness grounds, arguing that the affidavits disclosed new opinions beyond the district court's deadline for such disclosures. The district court appeared to grant both motions.

In an order dated January 8, 2018, the district court declined to strike the expert reports. The court then cryptically stated, "However, affidavits as opposed to reports that were filed are STRICKEN. The Court will not admit into evidence expert reports or affidavits, and reserves the right to strike, deny, or exclude part or all of any expert's testimony." No further explanation of the court's decision was given, and so the precise grounds for the decision are unclear. For purposes of our analysis, we assume the district court struck the affidavits on the grounds urged by Axon—timeliness.

District courts consider four factors when determining whether to exclude expert evidence as a sanction for the violation of a scheduling order. *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 372 (5th Cir. 2016). Those factors are: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Id.* (quoting *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990)).

The district court failed to examine (or even acknowledge) these factors when it excluded the expert reports as untimely. In fact, it gave no reasons for its decision at all. We are tasked with determining whether the district court "base[d] its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *CenterPoint Energy*, 436 F.3d at 550 (quoting *Ross*, 426 F.3d at 763). But "[w]here a district court fails to explain its decision . . . we do not know whether the decision was within the bounds of its discretion or was based on an erroneous legal theory." *Schwarz*, 767 F.2d at 133. We

therefore hold that to the extent the district court's order excluded the expert reports of Sones, Bourgoyne, Williams, Rusnak, Bellemare, and Adair on timeliness grounds, the order must be vacated and remanded to allow the district court to explain its decision after considering the proper factors.

In an order dated February 14, 2018, the district court granted Axon's motion to exclude the Sones and Bourgoyne summary judgment affidavits and offered a brief explanation. It concluded that both experts' affidavits "merely distort issues already resolved by the same affiants' report (SEMS) to the federal government." It further explained that, in its view, the affidavits failed to scientifically establish that the BSRs were defective. Finally, the court noted that "[e]qually important to this decision, no dispute exists concerning the nature of the well blowout or the factors that caused[] or contributed to it."

Like the first order, this second order also failed to examine the required factors. *See In re C.F. Bean*, 841 F.3d at 372. And the brief reasoning the district court did give is questionable. The district court concluded that the affidavits contradicted issues in the SEMS Report. It then perplexingly concluded that—even though it had just recognized a conflict in the evidence—"no dispute exists concerning the nature of the well blowout or the factors that caused[] or contributed to it." But expert testimony is not subject to exclusion just because it contradicts other evidence in the record—to the contrary, at summary judgment that is the main point of expert evidence. *Cf.* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact . . . ."). The district court's explanation therefore did not justify the exclusion.

We do not decide here, however, what the result of the proper legal analysis should be. Rather, because the district court failed to examine the required factors, and the brief explanation it did offer is dubious, we vacate the

No. 18-20453

order denying the Sones and Bourgoyne affidavits and remand to allow the court to undertake the proper analysis in the first instance.[18]

## C. *LPLA Products-Liability Claim*

We now proceed to the district court's grant of summary judgment on the merits of the products-liability claim. As previously discussed, Plaintiffs were required to show that (1) a characteristic of Axon's parts proximately caused the damage; (2) the damage arose from a reasonably anticipated use of the parts; and (3) the parts at issue were unreasonably dangerous. *See* La. Stat. Ann. § 9:2800.54(A). The district court granted Axon summary judgment because it concluded that Plaintiffs failed to show that a question of material fact existed regarding causation and the unreasonably dangerous nature of the equipment. Axon urges affirmance on these grounds and asserts that the "reasonably anticipated use" prong provides an alternative ground for affirmance. We address each of these elements in turn.

1.

To establish causation, Plaintiffs were required to establish that the equipment Axon worked on proximately caused the blowout. In Louisiana, "[a] proximate cause is generally defined as any cause which, in natural and continuous sequence, unbroken by any efficient, intervening cause, produces the result complained of and without which the result would not have occurred." *Hutto v. McNeil-PPC, Inc.*, 79 So. 3d 1199, 1213 (La. Ct. App. 2011) (quoting *Sutton v. Duplessis*, 584 So. 2d 362, 365 (La. Ct. App. 1991)).

In granting Axon summary judgment, the district court concluded that Plaintiffs failed to meet this burden. It based its decision "for the most part[]

---

[18] The district court's summary judgment order on causation discusses the exclusion of expert evidence. This order suffers from the same lack-of-reasoned-explanation flaw as the two orders discussed. To the extent this order operates to exclude the expert evidence discussed, it must be vacated as well.

on the SEMS and BSEE Reports and the testimony of Walter's on[-]site personnel." The court specifically concluded that "the SEMS Report of findings is unimpeached." Though not entirely clear, it appears that the district court believed that the SEMS and BSEE reports were dispositive on the issue of causation, and that summary judgment for Axon was therefore appropriate.

We disagree. Our *de novo* review of the evidence finds disputes of material fact regarding causation.

First, Plaintiffs produced evidence that the BSRs did not seal the drill pipe as they should have. Defense expert Bill Abel testified that flow from the well through the BOP would have stopped had the BSRs sealed properly. Another witness, Wilson, concurred. And a third witness, Bradley Pitts, testified that after the BSRs had been activated, gas continued to flow up through the rig floor and drill pipe. In fact, Pitts testified that the flow was not coming from the still-open choke line but was "all coming up the annulus . . . [a]nd the drill pipe." A jury could conclude, based on this evidence, that the BSRs did not seal the drill pipe as they should have.

Next, there is evidence that the continued flow from the annulus and drill pipe prevented the crew from successfully shutting in the well. Wilson testified that the crew had been unable to undertake "normal well control procedures" because the flow continued. Abel testified that, after activating the BSRs, the crew's next step would have been to close the choke line by whatever means necessary. Wilson testified that after the BSRs had been remotely activated, three workers attempted to return to the rig floor, but were unable to because the well started blowing out again. And one of the expert witnesses, Terry Brittenham, stated that it is likely that the crew may have been trying to access the rig floor to manually close the choke valve, and that if they had been able to do so, that would have been enough to stop the blowout had the BOP parts worked as intended.

No. 18-20453

This evidence creates a material fact dispute that precludes summary judgment. A fact-finder could reasonably conclude, based on this evidence, that the alleged defect in the BSRs prevented the flow from stopping after the BSRs had been activated. The fact-finder could also conclude that the continued flow prevented the rig crew from being able to manually close the choke flow path. In other words, a fact-finder could conclude that the alleged BSR defect was a "cause which, in natural and continuous sequence, unbroken by any efficient, intervening cause," produced the blowout and that without the BSR defect the blowout would have been contained. *Hutto*, 79 So. 3d at 1213.

While other evidence also suggests that crew error may have been an additional cause of the blowout, a reasonable fact-finder still could conclude that a non-defective BOP would have, under the circumstances, allowed the crew to prevent the blowout. *See Stewart v. Capital Safety USA*, 867 F.3d 517, 521 (5th Cir. 2017) ("To find injury causation here, a jury would at least have to conclude that a different lifeline cable or a different warning would have, under the circumstances of this accident, prevented [the accident]."). A jury could have returned a verdict in Plaintiffs' favor on this issue, *see Liberty Lobby*, 477 U.S. at 248, and we therefore hold that the district court erred by granting summary judgment in Axon's favor on the issue of causation.

2.

The district court also granted Axon summary judgment on the grounds that Plaintiffs failed to create a question of material fact on the "unreasonably dangerous condition" prong of the LPLA test. Because the court gave no reasons for doing so, however, we cannot know the basis for its ruling.

When ruling on a summary judgment motion, "[t]he court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a). This court has "many times emphasized the importance of a detailed discussion by the trial judge." *McIncrow v. Harris County*, 878 F.2d 835, 835–

34

36 (5th Cir. 1989). When district courts have failed to do so, we have on occasion vacated and remanded. *See D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 210 n.13 (5th Cir. 2018) (district court erred by "failing to state the reasons for granting summary judgment . . . as is required by Rule 56(a)"); *Baker v. TDCJ-CID*, 774 F. App'x 198, 199 (5th Cir. 2019) (unpublished) (same). However, because our review here is *de novo*, we need not vacate and remand if we can ourselves determine whether summary judgment is appropriate.

Vacatur and remand is appropriate here for two reasons. First, the district court's opinion is "pithy to the point of being incomplete." *Myers v. Gulf Oil Corp.*, 731 F.2d 281, 283 (5th Cir. 1984). The entire ruling consists of a single sentence. Second, vacatur here is appropriate because of our decision to vacate the exclusion of Bellemare's testimony. *Cf. 103 Inv'rs I, L.P. v. Square D Co.*, 372 F.3d 1213, 1218 (10th Cir. 2004) ("Because the decision to grant summary judgment was premised upon its exclusion of the expert reports, we REVERSE the district court's decision to grant summary judgment . . . ."). As we previously noted, Bellemare's testimony forms much of Plaintiffs' case on this issue. Thus the district court's decision regarding Bellemare's testimony will have a substantial impact on the appropriateness of summary judgment. We express no view on the outcome of the issue, but vacate so that the district court, having reviewed anew the admissibility of Bellemare's testimony, can then explain its decision on this issue.

No. 18-20453

3.

Axon next offers the LPLA's "reasonably anticipated use" prong as an alternate ground for affirmance. We hold that questions of fact exist on this issue as well and that summary judgment is therefore inappropriate.[19]

Axon makes two primary contentions. First, it asserts that the BOP and BSRs are blowout *preventers*, but not blowout *stoppers*. Thus, the argument goes, using the BSRs to stop a blowout already in progress is not a reasonably anticipated use. Second, it asserts that it was not reasonably anticipated that the BSRs would be used in a situation where a rig crew attempted to close the BSRs but not the HCR valve.[20]

Fact questions exist on both issues. Louisiana defines "reasonably anticipated use" as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. Stat. Ann. § 9:2800.53(7). Obviously dangerous uses and uses contrary to industry practice are not reasonably anticipated. *Kampen v. Am. Isuzu Motors, Inc.*, 157 F.3d 306, 312 (5th Cir. 1998) (en banc).

---

[19] Axon believes Underwriters has waived its arguments on this issue because Underwriters' opening brief did not spend much time on it. We disagree. The district court's summary judgment decision did not rest on the reasonably anticipated use prong, and so Underwriters had no occasion to address it in its opening brief. After Axon raised the issue as an alternative ground for affirmance, Underwriters sufficiently addressed the issue in its reply. That distinguishes this case from the case Axon cites, *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 771 F.3d 301 (5th Cir. 2014). There, the petitioner "d[id] not brief [the waived] argument beyond [a] conclusory statement" and a citation to an unpublished district court order containing no reasoning on the point. *Id.* at 303 n.2. That is not the case here.

[20] Axon also asserts that it was not reasonably anticipated that the crew would use the BSRs in a situation in which the accumulator—the device that operated the BSRs—malfunctioned. But Axon never made that argument in the district court. Its summary judgment motion on the "reasonably anticipated use" prong did not make arguments regarding the accumulator. "Arguments not raised in the district court cannot be asserted for the first time on appeal." *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 669 (5th Cir. 2004). We therefore do not consider this argument.

Courts do not define a product's "use" at a high level of generality and may consider the user's negligent conduct. *Id.*

Plaintiffs produced evidence that would allow a fact-finder to conclude that the rig crew's attempt to use the BSRs to stop the in-progress blowout was reasonably anticipated. Axon contends that "the evidence shows that no one expects BOPs to be operated during a blowout." But the report of one of Plaintiffs' experts, Sones,[21] stated that BOPs are regularly used in the industry to prevent blowouts in progress. In fact, the report states that "situations involving the decision to activate blind shear rams are even more likely to occur when a well is already flowing, possibly even flowing onto the rig floor, as this closure is considered a last resort. . . . There is little if any reason to use the shear/blind rams if a well is not flowing." For that reason, the report opines that it is often *expected* that the well will be flowing when the BSRs are activated. The expert thus testified that the crew's actions were "reasonable and consistent with industry standards."

Regarding Axon's second contention—*i.e.*, that it was not anticipated that the crew would try to close the BSRs while leaving the HCR valve open— Plaintiffs' expert testified that the rig crew's actions were "normal in the industry." The testimony was that during a "soft shut in" procedure, the crew would have closed the annular first, followed by the other rams, and then the HCR valve would have been closed last. This procedure, the expert testified, is "normal" and "a reasonable method for controlling a kick."

A jury could conclude, based on this expert evidence, that the rig crew's use of the BOP and BSRs in an attempt to stop an in-progress blowout was

---

[21] Although Axon moved to strike deposition testimony from Sones that it argued constituted new opinions not found in his original report, it never moved to strike his original expert report, the source of this testimony.

reasonably anticipated. Summary judgment is thus inappropriate on this element of Plaintiffs' LPLA claim. *See Liberty Lobby*, 477 U.S. at 248.

V.

Lastly, we address the district court's award of fees. Because our conclusions regarding multiple summary judgment decisions by the district court mean that the judgment no longer reflects an accurate disposition of the case, we VACATE the judgment, as well as the various orders entered awarding fees to the parties based on its summary judgment decisions.

\* \* \*

We AFFIRM the summary judgment as to Hercules' duty to defend, hold harmless, and indemnify Axon. We REVERSE the summary judgment as to Walter's duty to directly indemnify Axon. We REVERSE the summary judgment as to Walter's duty to indemnify Hercules for Axon's claims. We VACATE the district court's order excluding Bellemare's testimony. We VACATE the district court's orders excluding the expert reports of Sones, Bourgoyne, Williams, Rusnak, Bellemare, and Adair, as well as the orders excluding the affidavits of Sones and Bourgoyne. We REVERSE the summary judgment as to the causation and "unreasonably dangerous condition" prongs of the LPLA. And we VACATE the district court's final judgment and fee orders. The case is REMANDED for proceedings consistent with this opinion.