# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 15, 2020

Lyle W. Cayce
Clerk

No. 19-20152

In the Matter of: Alabama & Dunlavy, Limited; Flat Stone II, Limited; Flat Stone, Limited;

*Debtors*,

Jay H. Cohen, Individually and as Trustee of the JHC Trusts I and II,

*Appellant*,

*versus*

John Gilmore, Administrator of the Estate of Robert Haden Abercrombie; Texas Abercrombie Family Interests, Limited,

*Appellees*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:16-CV-283

---

Before Graves, Costa, and Engelhardt, *Circuit Judges*.

James E. Graves, Jr., *Circuit Judge*,

Appellant Jay Cohen contends that Appellee Robert Abercrombie played a key role as a strawman purchaser in a fraudulent land transfer where

No. 19-20152

valuable property passed from a limited partnership named Alabama & Dunlavy ("A&D") to another limited partnership in Abercrombie's control named Texas Abercrombie Family Interests, Ltd. ("TAFI"). An associate of Cohen named Matthew Dilick controlled A&D's general partner while Cohen controlled A&D's largest limited partner. Cohen claims that Dilick and Abercrombie made millions from the transaction and that Abercrombie's actions helped conceal Dilick's involvement in the self-dealing sale and helped Dilick breach his fiduciary duties and commit fraud.

Before the suit was removed to federal court under bankruptcy jurisdiction, a Texas state trial court granted several evidentiary objections to Cohen's detriment, dismissed Cohen's claims against Abercrombie and TAFI on summary judgment, and expunged a notice of *lis pendens* that Cohen had placed on the property. This appeal concerns the grant of those orders.

We find that the state trial court abused its discretion in granting the evidentiary objections and granted summary judgment despite there being issues of material fact with respect to all of Cohen's claims. We also find that the controversy surrounding the state court's expungement of the notice of *lis pendens* is moot because the property at issue was sold to a third party months after the trial court's expungement. We therefore affirm in part, vacate in part, and remand for proceedings consistent with this opinion.

I.

This suit involves a seven-and-a-half-acre tract located at the corner of Alabama and Dunlavy inside Loop 610 in Houston, Texas. In 2005, the limited partnership A&D, was formed and the Alabama property transferred into it. The Cohen-controlled JHC II Trust was an eighty percent limited partner in A&D. Rock Hill Development was a ten percent limited partner, Matthew Dilick was a nine-and-a-half percent limited partner, and a Dilick-

2

controlled company named Commerce Equities II held the remaining half percent as the general partner.

Over the years, Dilick, on behalf of A&D, borrowed approximately $13.5 million against the Alabama property. At the end of 2008, the recession began, and the debt, which was then held by Wedge Real Estate Finance, matured. Wedge refused an extension and threatened foreclosure. But Dilick succeeded in postponing the foreclosure just long enough to sell the property to TAFI in early 2009.

Abercrombie had previously tried to develop the property by securing ground leases with CVS and Kroger, but those deals had fallen through. In fall 2009, Dilick learned from Abercrombie that HEB wanted to put a grocery on the Alabama property through a long-term ground lease. Dilick had experience with such leases and knew from an estimate provided by QuadCapital Advisors, LLC, that the Alabama property with the HEB lease would be enough collateral for a loan of over $18 million.

In December 2009, Abercrombie and Dilick approached Howard Herbert, trustee of JHC Trust II, about selling the Alabama property. The parties initially agreed to a $16.7 million purchase price, which Herbert accepted because he thought it would result in around $3 million in profit for the partnership. The only other offer at the time was from Wal-Mart for about $9 million.

But Dilick and Abercrombie concealed details from A&D, including Abercrombie's negotiations with HEB and Dilick's emails with a HEB representative, wherein he answered questions about the property. Dilick also concealed the QuadCapital report stating that the property coupled with a long-term ground lease could be worth over $18 million.

On February 4, 2010, HEB agreed to the terms of a lucrative long-term lease of the Alabama property with TAFI (an entity not formed until

No. 19-20152

February 9, 2020). Abercrombie signed the term sheet for the HEB lease on behalf of TAFI. He also signed TAFI's limited partnership agreement as a representative of its general partner, as a limited partner, as the manager of a different corporation and limited partner called European Capital Fund ("ECF"), and as the manager of two other non-existent, never-formed companies listed as limited partners.

Though the terms were in place, Abercrombie and Dilick still had problems. HEB could back out of the lease. TAFI did not yet own the property. And Wedge had scheduled foreclosure. This meant that Dilick and Abercrombie had to move quickly to transfer the property from A&D to TAFI. To do so, Dilick sought a bridge loan from Adam Acquisition Company to pay off Wedge.

Although Adam Acquisition lent the money to TAFI, it was Dilick, not Abercrombie who made the arrangements. On February 11, 2010, Dilick emailed Adam Acquisition seeking a "personal bridge loan" for $15 million. The next day, counsel for Adam Acquisition emailed Dilick about the prospects of a loan to him or to an entity he owned. Dilick then provided documentation to Adam Acquisition including an undated, notarized statement in which both he and Abercrombie certified that "any and all investments, loans, legal and organization documents with Mr. Don Adams are 100% in the sole control and sole decision-making authority of Matthew G. Dilick." Adam Acquisition's counsel testified that he thought this meant Dilick oversaw Abercrombie and TAFI. After all, Dilick's CPA and his in-house counsel produced TAFI's financial statement and provided an opinion of counsel for Adam Acquisition.

On February 26, 2010, Dilick, acting on behalf of the A&D partnership, sold the Alabama property to TAFI. Dilick provided TAFI the $2 million that it needed to close the $15 million bridge loan. And Dilick, not

Abercrombie, personally guaranteed the loan. But the sale was not for the agreed upon price of $16.7 million. Instead, Dilick sold the property for the lesser amount of $13.5 million, which was just enough to pay off Wedge. A&D also received an unsecured, non-recourse note from Abercrombie for $334,837. It appears that Abercrombie was unable to contribute financially to the deal's closing as he had recently asked Dilick for a loan to help him avoid returning to jail for a failure to pay child support.

Abercrombie could, however, contribute his signature. On June 17, 2010, following the sale from A&D to TAFI and with the HEB lease in place, TAFI closed a $19.9 million loan secured by the Alabama property. At the closing, Abercrombie testified that "[he] signed a bunch of blank documents, . . . just signature pages" and that "[he] didn't look at any of it. [He] just signed them."

These blank pages sent money to multiple entities. From the disbursements at closing, TAFI received $2.94 million. But $1.06 million of that $2.94 million left TAFI and traveled a circuitous path to Dilick's Commerce Equities. First, it went into an account that had been opened in the name of TAFI's limited partner ECF. Though Abercrombie signed paperwork as ECF's manager, Dilick's associate and tenant Luis Bodmer, not Abercrombie, opened the account. Bodmer had nothing to do with ECF on paper and no authority to act for it, yet he signed the bank paperwork as member and manager of ECF.

After spending twenty-four hours in the ECF account, the money passed into the account of Kings Cross Ventures, a restaurant business run by Michael Horan that operated out of a location Dilick leased to him. After receiving the funds, Horan transferred them in two separate transactions on two consecutive days into an account for Mid Rise Builders. From there, the money was mixed with other funds and then transferred into Commerce

Equities. Someone also transferred $225,000 from ECF to Richard Golden. Golden was HEB's director of real estate, with whom Abercrombie and Dilick had started lease negotiations back in November 2009. Cohen contends this was a kick back.

## II.

Cohen sued Abercrombie and TAFI, among several others, in Texas state court seeking redress for the sale of the Alabama property to TAFI and the subsequent $19.9 million loan from which the Dilick-controlled Commerce Equities received at least $1 million. Cohen asserted against Abercrombie and TAFI claims for conspiracy to commit fraud, conspiracy to breach a fiduciary duty, aiding and participating in a breach of fiduciary duty, and fraudulent transfer under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). Along with monetary damages and attorney's fees, Cohen sought to rescind the allegedly fraudulent transfer of the Alabama property and restore its title free and clear of fraudulently created liens.

Abercrombie and TAFI filed a summary judgment motion. In November 2013, the state trial court granted that motion in full and expunged a notice of *lis pendens* that Cohen had placed on the Alabama property. This case then traveled a peculiar path to the Fifth Circuit and has left us in the position of having to review a grant of summary judgment entered in Texas state court some seven years ago.

On February 24, 2015, following the Chapter 7 bankruptcy filing of the limited partnerships involved in the case, including A&D, Regions Bank (another defendant) removed the state case to federal court pursuant to the bankruptcy removal statute. *See* 28 U.S.C. § 1452. The subsequent reference to the United States Bankruptcy Court for the Southern District of Texas was soon withdrawn and the case taken up by the United States District Court for the Southern District of Texas. The district court entered an agreed final judgment on February 7, 2019. In the intervening seven years between the state court's grant of summary judgment and the district court's

No. 19-20152

entry of final judgment, Abercrombie, and the attorney who represented him in state court, both passed away, and the Alabama property, free of the *lis pendens*, was sold to Montrose Real Estate Partners in July 2014.[1]

The district court neither addressed the claims against Abercrombie in detail nor issued an order adopting the state court's rulings as its own, and neither Abercrombie nor TAFI participated in the district court litigation. So what happens when, as here, a party appeals a state trial court decision to a federal court of appeals without a federal district judge's prior consideration?

In this circuit, when a case is removed from state court to federal court, the federal court takes the case as it finds it and treats the state court rulings as its own. *In re Meyerland Co.,* 960 F.2d 512, 520 (5th Cir. 1992) (en banc) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters, Etc.*, 415 U.S. 423, 435–36 (1974) ("Judicial economy is promoted by providing that proceedings had in state court shall have force and effect in federal court, so that pleadings in state court, for example, need not be duplicated in federal court.")).

Since the Fifth Circuit has eschewed legal formalities and treated cases like this one as reviewable even if the district court provided little discussion of the state court decision, this case is ready for appellate review.[2]

---

[1] Federal Rule of Evidence 201(b)(2) provides that Courts may "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

[2] The only mention of Abercrombie and TAFI by the District Court came when it addressed a 12(b)(6) motion to dismiss filed by remaining defendants. There, towards the end of the order, the district court denied the motion but inexplicably granted the motion with respect to Abercrombie and TAFI saying that:

> [T]o the extent these cross-claims have already been resolved by the summary judgments granted by the state district court in Cause No. 2010-20973 in favor of Bayou on the Bend Hold, Ltd., SE Texas Note Acquisitions 2010-11, LLC, Robert Haden Abercrombie and Texas Abercrombie Family Interests, Ltd., the Motion is granted with regards to those entities.

*In re Meyerland Co.,* 960 F.2d at 520 (holding that the district court should simply "take the state judgment as it finds it, prepare the record as required for appeal, and forward the case to the appellate court for review."); *see also Breedlove v. Cabou*, 296 F. Supp. 2d 253, 263 (N.D.N.Y. 2003) (collecting and comparing cases). Neither party contests jurisdiction.

## III.

The outcome of this *de novo* review hinges on the record evidence we can and should consider. *See Ford Motor Credit Card Co. v. Bright*, 34 F.3d 322, 324 (5th Cir. 1994). TAFI and Abercrombie contend that much of the evidence is improperly before this court because the state trial court did not grant the motion admitting the evidence until a month after it granted the motion for summary judgment. But this is not as strange as TAFI and Abercrombie make it sound.

Some of the summary judgment evidence filed was the subject of a protective order, and while it was attached and submitted alongside Cohen's filings related to the relevant motions, it was not formally admitted into the record until after the trial court completed an *in camera* review. A read of the state court documents relating to the summary judgment motion reveals that the trial court had all the evidence before it and reviewed the same evidence currently before this court. So, this is not a case where, as TAFI and Abercrombie would describe it, the panel is reviewing evidence that was not before the trial court.

Cohen contends that the state trial court abused its discretion in granting several evidentiary objections in TAFI's and Abercrombie's favor.

---

Since the district court cannot dismiss claims that previously were dismissed following a grant of summary judgment, it appears that the district summarily granted parts of the motion in error. We see the grant of the 12(b)(6) motion as an ineffectual slip of a pen best construed as an attempt at saying that the state court's previous rulings are left undisturbed.

*See Bright*, 34 F.3d at 324. We agree. The grant of these objections improperly excluded important evidence from consideration. To start, the state trial court offered no explanation as to why it granted the objections. It simply checked boxes on a form saying that the objections were sustained. Since a trial court can abuse its discretion by failing to explain the reasons for excluding evidence, the lack of a reasoned explanation weighs in favor of overturning the objections. *See Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 268–69 (5th Cir. 2020). Courts also typically consider evidence unless the objecting party can show that it could not be reduced to an admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2); *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017).

The first two objections are sweeping and seek to exclude almost all of Cohen's evidence or alternatively, limit the evidence considered. But TAFI and Abercrombie admitted that an inadvertently excluded affidavit cured the authentication issues that supported the objections, and there is, again, no specific reason as to why we cannot consider all the evidence before us.

Three of the objections concern the Alabama property's value and address a property appraisal, Dilick's valuation of the property in an affidavit, and a TAFI financial statement listing the value of the property. While some of this evidence may be considered hearsay in certain contexts, TAFI and Abercrombie have not shown that it is entirely inadmissible. It could for example be admitted to provide clarity or be considered as a statement by a party and admitted under Federal Rule of Evidence 801(d)(2).

The final objection concerns a diagram that Cohen prepared to illustrate the flow of funds after the parties closed the $19.9 million loan on the Alabama property. The underlying bank records support this exhibit and TAFI and Abercrombie offer no explanation as to why it would be inadmissible. Thus, we conclude that the state trial court abused its

No. 19-20152

discretion when it granted these objections without explanation, and we consider all the evidence before us.

IV.

A.

Cohen sued Abercrombie and TAFI under the Texas Uniform Fraudulent Transfer Act. TUFTA prevents debtors from prejudicing creditors by improperly moving assets beyond their reach. Cohen qualifies as a creditor for purposes of this claim because a trust that he controlled had an ownership interest in the A&D partnership and a right to payment when Dilick sold A&D's sole asset and then derived millions of dollars in profits when he, Abercrombie, and TAFI refinanced that asset. *See* Tex. Bus. & Comm. Code § 24.002(2)-(6). Under TUFTA, a transfer made with actual or constructive intent to defraud any creditor may be avoided to satisfy the creditor's claims. The act defines a fraudulent transaction in two ways:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation:
>
> > (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

*Id.* § 24.005.

Cohen has shown there is a question of material fact with regard to both versions of the TUFTA test, i.e., he has made credible allegations that Abercrombie and Dilick brought about the transfer of the Alabama property from A&D to TAFI with either the actual intent to defraud him or without paying a reasonably appropriate value for A&D's lone asset. *See Id.* § 24.005(a)(1)&(2).

1.

Because the intent to hinder, delay, or defraud creditors is seldom susceptible of direct proof, TUFTA provides badges of fraud on which creditors and courts can rely. *Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 128 (Tex. 2019). TUFTA lists eleven nonexclusive indicia of fraudulent intent that include: transfer to an insider, concealment of the transfer, transfer of substantially all the debtor's assets, and failure to obtain consideration reasonably equivalent to the value of the asset transferred. Tex. Bus. & Comm. Code § 24.005(b). Evidence of a single badge of fraud does not conclusively demonstrate intent, but a confluence of several presents a strong case of fraud. *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566–67 (Tex. 2016).

Cohen has shown that there is a question of fact concerning Abercrombie's and Dilick's intent as the four badges of fraud listed above are present here. The act considers Dilick, as the person in control of A&D's general partner, an insider. Tex. Bus. & Comm. Code § 24.002(7)(C)(i). While A&D did not sell the property directly to Dilick, he derived $1.06 million in profit from the eventual loan, which traveled from

No. 19-20152

TAFI to his company through a bank account opened by his associate. A jury could conclude that acting as an insider, Dilick drained the assets of the A&D partnership. Dilick and his associates, as well as TAFI and Abercrombie, went to great lengths to conceal his involvement in the sale, and the sale left A&D without assets. There also remains a question as to whether A&D received a reasonably equivalent value in exchange for the property.

2.

TUFTA defines "reasonably equivalent value" as a transfer or obligation within the range of values for which the transferor would have sold the assets in an arm's length transaction. *Id.* § 24.004(a), (d). TAFI argues that it paid a reasonably equivalent value because the property was on the brink of foreclosure and the only other offer for the property was an approximately $9 million offer from Wal-Mart. It indeed appears A&D could not forestall foreclosure much longer, and that there was no hope of refinancing the undeveloped property. That suggests there was little equity in the property absent a development deal similar to the HEB lease. But TAFI's $13.5 million payment was about the lowest offer A&D could accept. Cohen points to the TAFI balance sheet and underlying appraisals that value the Alabama property at over $26 million and to the initial offer from TAFI of approximately $16.5 million as evidence the property was worth more. Consequently, the question of whether TAFI paid a reasonably equivalent value for A&D's only asset remains. *See Id.* § 24.005(a)(2)(A).

B.

Since a jury could find this transaction fraudulent, the question now becomes whether Cohen can seek recourse against TAFI and Abercrombie as the transferees. A creditor can recover damages from a transferee under TUFTA but not if the transferee took in good faith and for a reasonably equivalent value. *Id.* § 24.009(a). Like the reasonably equivalent value

12

question, the question of whether TAFI and Abercrombie took in good faith remains disputed.

TUFTA does not define good faith, so Texas courts have looked to its common meaning. *Janvey v. GMAG*, 592 S.W.3d at 129. Good faith has been defined as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing . . . or (4) absence of intent to defraud or to seek unconscionable advantage." Good Faith, BLACK'S LAW DICTIONARY (11th ed. 2019). Good faith thus requires honest and reasonable conduct considering known facts and conduct free from both improper motive and willful ignorance of fraud. *Janvey v. GMAG*, 592 S.W.3d at 129; *Railroad Comm'n of Tex. v. Gulf Energy Expl. Corp.*, 482 S.W.3d 559, 569 (Tex. 2016); *Wichita Cty. v. Hart*, 917 S.W.2d 779, 786 (Tex. 1996).

Under Texas law, TAFI's and Abercrombie's good faith purchaser defenses will fail if they were on inquiry notice of fraud. *See Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*, 387 S.W.3d 74, 85 (Tex. App. 2012). Texas courts have said that a transferee is on inquiry notice when it "takes property with knowledge of such facts as would excite the suspicions of a person of ordinary prudence" regarding "the fraudulent nature of an alleged transfer." *Hahn v. Love*, 321 S.W.3d 517, 527 (Tex. App. 2009).

At minimum, a jury could find that Abercrombie knew of red flags that would have prompted a reasonable person to investigate. Abercrombie denies knowing details, but he knew enough to suspect that Dilick was on both sides of the sale and that the sale was not an above-board, arm's length transaction. Abercrombie knew that Dilick organized the sale to TAFI and that Dilick provided information to help secure the HEB lease. Abercrombie also spoke with Howard Herbert, the trustee of Cohen's trust, and knew that Herbert knew nothing about the HEB lease. Moreover, Abercrombie knew that Dilick dropped the price for the Alabama property by about $3 million shortly before

closing and assumed that there were no issues when Herbert says he protested the price drop.

Abercrombie could not contribute monetarily to the deal, but he could lend his signature any time it was needed. Abercrombie signed documents to help Dilick and TAFI get a bridge loan to close the deal with A&D. Those documents represented that Dilick was in control of the bridge loan proceeds lent to TAFI, when, at least on paper, Dilick had no stake in TAFI or control over it. He also signed all the documents for the post-sale $19.9 million loan that sent millions of dollars into TAFI. At the loan's closing, he claims he asked no questions about who was getting what and insisted that he did not look at anything. He claims that he did not know that Dilick received $1.06 million from the loan proceeds, and in his deposition said that he was glad someone found out what happened to the money.

But it makes no sense for Dilick to risk millions of dollars, have his CPA produce a balance sheet for an entity he had no control over, and have his in-house counsel write an opinion letter blessing a deal that Abercrombie implies was going to return him nothing. Abercrombie shouldered none of the financial risk while Dilick put millions of his own dollars at stake as collateral, and Abercrombie claims to have asked no questions about what was happening. While Abercrombie might not have known all the facts, such willful ignorance of the details of a multimillion-dollar transaction involving the purchase, development, and refinancing of a valuable property is enough to allow a reasonable jury to conclude that TAFI and Abercrombie were serving as cover for Dilick and that the two were engaged in fraudulent behavior that breached the fiduciary duties that Dilick owed to A&D. Abercrombie and TAFI cannot as a matter of law claim they were good faith purchasers.

## C.

The intentional torts of fraud and breach of fiduciary duty can both be the basis of a civil conspiracy. *Ernst & Young v. Pacific Mut. Life Ins. Co.*, 51

S.W.3d 573, 583 (Tex. 2001) (fraud); *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 450 (Tex. App. 2006) (breach of fiduciary duty). In order to establish a civil conspiracy, Cohen must show that appellees and Dilick intended to defraud him or breach a fiduciary duty owed to him (or the trust) and that one of the two acted in furtherance of that objective to his detriment. *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005).

Because civil conspiracies to defraud are conceived in secrecy and executed so as to avoid detection, parties ordinarily rely upon circumstantial evidence to establish their existence. *Kirby v. Cruce*, 688 S.W.2d 161, 164 (Tex. App. 1985). While such reliance is permissible, the chain of inferences cannot get too long. *See Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856–58 (Tex. 1968).

Here, only a few inferences are needed to conclude that Abercrombie, TAFI, and Dilick acted with the intent to commit fraud and breach fiduciary duties. The evidence shows that Abercrombie and Dilick worked together to transfer the Alabama property to TAFI, to secure the HEB lease, to obtain a $19.9 million loan, and to share the proceeds of that loan, which allowed Dilick to net $1.06 million outside of the A&D partnership. Abercrombie played a key role. He signed documents that formed TAFI and its various partners, signed the HEB lease, closed the bridge loan with Dilick's help, closed the sale of the Alabama property, and closed the post-sale $19.9 million loan.

With respect to fraud, a jury could infer that Dilick and Abercrombie negotiated one price with Herbert to set the deal in motion only to lower the price at the last second when it was too late for A&D's limited partners to protest. That means a jury could find that the alleged bait-and-switch maneuver constituted a material misrepresentation intended to induce agreement to the sale of the Alabama property, or in other words, a reasonable jury could find that the maneuver constituted fraud. *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674–75 (Tex. 1998).

No. 19-20152

A jury could also find that Dilick breached his fiduciary duty of loyalty when he allegedly backchanneled information to HEB regarding the Alabama property, kept details about the development from the limited partners in A&D, and derived $1.06 million from the sale and refinance. *See, e.g., Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App. 2010). Abercrombie knew Dilick managed A&D's general partner, so it is no stretch to say that he knew Dilick was a fiduciary of A&D. Abercrombie was pivotal in helping Dilick execute the transaction and profit from it. A general partner owes the highest fiduciary duty to limited partners. And a self-dealing transaction where details are concealed from the limited partners and the limited partners have no chance to object is generally presumed to be unfair. *See In re Whittington*, 530 B.R. 360, 380 (Bankr. W.D. Tex. 2014); § 12:6.Self-dealing transactions, PARTNERSHIP LAW & PRACTICE § 12:6 (2019).

This same evidence could also allow a reasonable jury to find Abercrombie and TAFI liable for knowingly aiding or participating in a breach of fiduciary duty. *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (stating that a party that aids in a breach of fiduciary duty becomes a joint tortfeasor and is liable as such). Consequently, there are genuine disputes of material fact as to whether Abercrombie and TAFI were participants in a civil conspiracy to commit fraud and whether they conspired, aided, and participated in a breach of fiduciary duty.

D.

Abercrombie and TAFI argue that Howard Herbert accepted the deal's terms and that because of this, Cohen either waived his right to sue or should be estopped from pursuing these claims. Waiver requires knowledge of all the essential facts, and Herbert had no knowledge of the HEB lease and insists that he protested the price drop from $16.7 million to $13.5 million. Since Herbert lacked all the relevant information and protested the lower purchase price, TAFI and Abercrombie cannot establish these affirmative defenses as a matter of law.

No. 19-20152

V.

Finally, Cohen insists that the trial court abused its discretion in expunging his notice of *lis pendens* on the Alabama property. A *lis pendens* notice is limited to situations where the title to the property is directly implicated by the results of the lawsuit. *See Helmsley-Spear of Tex., Inc. v. Blanton*, 699 S.W.2d 643, 645 (Tex. App. 1985). While the state trial court's reasoning for dismissing the case and expunging the notice, in 2013, were questionable, reinstating a notice of *lis pendens* requires Cohen to show that prevailing on these claims would allow him to recover title to the Alabama property from TAFI and Abercrombie. TEX. PROP. CODE ANN. § 12.0071(c); *see also Lathrop v. Sakatani*, 141 P.3d 480, 486 (Haw. 2006) ("Even assuming . . . that the circuit court erred in granting the defendants motion to expunge, the plaintiffs would not be able to record another *lis pendens* upon the [] property inasmuch as the property has been sold and [defendants] do not hold title to it.").

TAFI, however, sold the Alabama property to Montrose Real Estate Partners in July 2014, over six months after the expungement of the notice of *lis pendens* at issue here and at a time when there was no ongoing litigation against TAFI and Abercrombie.[3] Cohen has presented no information as to who currently owns the Alabama property. But what is known, is that a party unaffected by these proceedings owns it.

Since TAFI cannot return title to property it no longer owns, this case, as it currently stands, is one where, though title to the land is sought, only monetary relief can be accorded. Actually recovering the property would

---

[3] The deed conveying the property from TAFI to Montrose Real Estate Partners, Ltd., who is not and has never been a party to any of the court actions, is filed under Clerk's File No. 20140315848 in the Real Property Records of Harris County, Texas.

require Cohen to sue its current owners—owners who could potentially benefit from a good faith purchaser defense. *See Knapp Dev. & Design v. Pal-Mal Prop., Ltd.*, 240 Cal. Rptr. 920, 925 (Cal. Ct. App. 1987) (finding that third-party purchaser who purchased property after expungement of *lis pendens* was presumed to be a bona fide purchaser). The claims currently pending against TAFI at best indirectly involve ownership of the Alabama property, and succeeding on them is but a potential step towards recovery. Because Cohen has failed to make a showing that his current claims directly put title of the Alabama property at issue, we decline to encumber a property sold some six-years ago by reinstating the notice of *lis pendens*.

## VI.

AFFIRMED in part, VACATED in part, and REMANDED for proceedings consistent with this opinion.